**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Meynardo MONTEMAYOR and Manuel Montemayor, Defendants-Appellants.**

**No. 82–2129.**

United States Court of Appeals,
Fifth Circuit.

April 4, 1983.

Michael J. Guinan, George E. Becker, Chicago, Ill., for defendants-appellants.

John M. Potter, Asst. U.S. Atty., Houston, Tex., R. Christopher Locke, Atty., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.

JOHNSON, Circuit Judge:

On November 17, 1981, a sixteen-count indictment was filed which charged eight different individuals with various narcotics offenses. Eleven of the sixteen counts were applicable to defendants Manuel and Meynardo Montemayor. Seven of the eleven counts charged substantive offenses. The remaining four counts charged defendants with conspiracy offenses. Count 3 charged defendants with conspiracy to distribute cocaine; Count 4, with conspiracy to distribute heroin; Count 5, with conspiracy to distribute marihuana. Each of these offenses was in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 9 charged defendants with conspiracy to manufacture and distribute heroin, knowing it would be imported into the United States, in violation of 21 U.S.C. §§ 959 and 963.

On January 26, 1982, a jury trial commenced with three of the eight named defendants on trial.[1] On January 28, at the close of the evidence, the district court dismissed the substantive counts. On February 1, the jury returned a verdict of guilty on each of the four conspiracy counts. After a poll of the jury revealed that one juror did not agree with the guilty verdict against co-defendant Alifonso Arredondo, the court granted a mistrial as to Arredondo.

Defendants Manuel and Meynardo Montemayor appeal their conviction on the four conspiracy counts. They claim that (1) the evidence was insufficient to convict them on any of the four counts, (2) the district court erred in admitting coconspirator hearsay statements, (3) the district court erred in denying defendants' motion to dismiss the indictment for vagueness and motions for a bill of particulars and for disclosure of the grand jury transcript, (4) the district court abused its discretion in admitting scientific evidence showing cocaine residue on items used by the conspirators, and (5) the district court erred in polling the jury separately as to each of the three

---

1. Two named defendants, Benito and Reyes Montemayor had fugitated before the trial began. Matias Montemayor was allowed to sever his case and was tried separately. Both Salvador Flores and Eufracio Garcia pleaded guilty prior to trial.

defendants to determine if the guilty verdicts returned were unanimous. We find no merit in defendants' last four contentions and we find the evidence sufficient to sustain the conviction for conspiracy to distribute cocaine. We therefore affirm the conviction on Count 3 for conspiracy to distribute cocaine and vacate the convictions on the other three conspiracy counts.

## I. Facts

Construed most favorably to the prosecution, the record reflects support for the following version of events. In 1975, Benito Montemayor's stepson, Ricky Lee Bowman,[2] who was on léave from the military, helped his stepfather and Salvador Flores count large sums of money and weigh and package marihuana in Benito's trailer in Chicago, Illinois. Both Bowman and Flores went to Mississippi to have boxes welded underneath a 1972 Dodge van in order to transport the marihuana. Benito returned to Chicago by plane and Flores took the van to Texas. Flores brought the van back to Chicago loaded with marihuana which Bowman helped him unload and take into Benito's house. After Bowman's undesirable discharge from the Army in March 1976, Bowman, along with his mother Eva, and Flores, assisted Benito in packaging marihuana and cocaine and in counting large sums of money—roughly amounts of $20,000 to $30,000 per person—three or four times a week.[3] Bowman testified that in 1976 he helped Benito package marihuana about fifteen to twenty times and helped package cocaine about five to seven times; he testified that pursuant to Benito's instructions he helped unload cocaine and marihuana from the Dodge van in Chicago on fifteen to twenty occasions. Bowman also testified that the cocaine and marihuana came from somewhere in Mexico and that Flores, who drove the van, told him that he, Flores, always crossed the border at Laredo.

Drug Enforcement Administration (DEA) Agent Frank Tucci, working in an under-cover capacity, purchased one pound of heroin from Flores in March 1976 in Chicago. Agent Tucci later spoke over the phone to a man who identified himself only as Flores' boss about both the purchase of the one pound of heroin and additional purchases of heroin. The boss told Agent Tucci that he "operated big" and could swing "six, seven, eight" as many as Tucci wanted, "in a day." Agent Tucci later spoke to Benito in person at his trailer and recognized his voice as the voice of the person who had identified himself on the phone as Flores' boss.

Defendant Meynardo entered the picture in the summer of 1977 in Chicago where he took part in a conversation about heroin with his brothers Benito, Matias, and Reyes. At that time, Bowman heard Meynardo and Reyes agree with Matias to go to Detroit to "take care of the deal"—to pick up thirty-two kilos of heroin.

Around August or September 1977, Benito, along with his wife and children, moved to a house in Monterrey, Mexico. Bowman testified that in the fall of 1977 there were at least five meetings in a brothel in that city. Defendants Manuel and Meynardo were both present at all of those meetings along with three of their brothers—Benito, Matias, and Reyes—and Bowman. The topic of discussion at these meetings was multikilogram cocaine and heroin deals in Detroit. Bowman testified that there was a period when Matias, who was the lead brother, had to get the approval of all of his brothers before a cocaine deal could be approved, or, in their parlance, could "go down." Bowman's testimony was that all the brothers agreed that a particular cocaine deal was a "good deal" and that Meynardo, Manuel and the other brothers gave their approval to various transactions. Also during the fall of 1977, after the move to Monterrey, Bowman helped load and unload large amounts of money and drugs concealed behind the taillights and fender wells of a Chevrolet Blazer. Bowman testified that defendant Meynardo, along with Beni-

2. The Government's case consisted primarily of Bowman's testimony.

3. At this time the trailer was in Des Plaines, Illinois.

to, Matias, Reyes, and a banker, was present on one occasion when Bowman helped count $500,000. Bowman was unable to recall whether Meynardo had helped count the money. The only time Bowman took the Blazer out it was loaded with cocaine and he took it to Huero Macias'[4] house in Cerralvo, Mexico.

On another occasion in the fall of 1977, Bowman went to Meynardo's house in Laredo where Bowman heard Benito and Meynardo talking about a load of marihuana that had not arrived. Meynardo protested to Benito that "it wasn't his fault."

Another event in the fall of 1977 was a birthday celebration for Matias near Cerralvo.[5] Among the guests were defendants Manuel and Meynardo, Bowman, Reyes, Matias, Benito, Robie (a sixth brother), Matias' bodyguards, workhands, a band, and some women from the brothel. Defendants Manuel and Meynardo, Bowman, Benito, Matias, Reyes, and Macias (the chemist) took a twenty-minute walk into the woods until they arrived at a cave which Benito called their "heroin lab." Everyone, including defendants Manuel and Meynardo, went inside the cave where two workhands were using wooden paddles to stir heroin in two large vats over a fire. The hands were skimming a brown substance off the top of the heroin and throwing it in piles on the ground. After observing for ten to twenty minutes, everyone except the two workhands went back to the ranch. When Bowman returned to Monterrey, he was instructed to clean the brown skim off both his own boots and Benito's. What Bowman finally had to do was to burn Benito's boots, which were badly corroded on the bottom, and all of their clothes.

Other heroin transactions took place in Chicago during this same period of time until about February 1978. These involved ten to eleven sales of pounds of heroin on

credit by Reyes to Carlos Gutierrez, who at the time of trial was incarcerated in Chicago. On the occasion of one of these sales, Benito and Matias were also present and Reyes obtained Matias' approval before selling Gutierrez an additional pound. On another occasion when they were "sniffing" cocaine, Reyes told Gutierrez that his (Reyes') brothers were bringing cocaine to Chicago, although Reyes did not name the brothers.

In the fall of 1979, there were several drug-related meetings and get togethers in the guesthouse behind Benito's house in McAllen, Texas. Defendants Manuel and Meynardo attended these meetings and parties which occurred during a three-week period when Bowman stayed at the guesthouse. Although Bowman did not actually see the weighing and packaging, he stated that defendants Manuel and Meynardo, along with Benito, Matias, and Pancho, weighed and packaged cocaine on the pool table at the parties. Pursuant to Benito's instructions, Bowman cleaned the pool table with a brush after each such party. After one of the parties in the guesthouse, defendants Manuel and Meynardo, Benito and Matias, among others, were standing outside around the Chevrolet Blazer and a basket of cocaine.[6] Bowman refused to follow Benito's instructions to take a screwdriver and help Pancho load the fender wells of the Blazer. As Bowman left to go back to the house, he observed Pancho prepare to take the fender wells off. When Bowman later returned, the Blazer and people were gone. Subsequent to this occasion, defendants Manuel and Meynardo were present at another gathering which involved loading the Blazer and which culminated in a "coke-snorting" party in the guesthouse. Still another meeting in McAllen took place in the master bedroom of Benito's house rather than the guesthouse. Defendants Manu-

4. Macias was a handyman who was known as "the chemist."

5. There were two ranches in Cerralvo, one occupied by Matias and the other by Benito. Reyes also had a warehouse or farm near Cerralvo.

6. Although at one point in his testimony Bowman stated that the basket contained brown paper packages filled with money or drugs, he later identified it as a "basket of cocaine."

el and Meynardo, as well as Matias and Pancho, entered Benito's bedroom carrying duffle-type shoulder bags, locked the door, and emerged after two hours with the bags.

Finally, it was brought out at trial that Meynardo had amassed a wealth disproportionate to his legitimate employment: he had put $125,000 cash down payment on a house in Laredo; he ran a used car lot in (Nuevo) Laredo, Mexico; he was a part owner in a Mexican corporation; he also had a grocery store which was ultimately sold at a sheriff's auction in Chicago.

## II. *Sufficiency of the Evidence*

■ Defendants first contend that the evidence was insufficient to support a conviction on any of the four conspiracy counts. Both the Government and defendants agree that the concurrent sentence doctrine is applicable to this case. Under that doctrine, the existence of one valid conviction may make unnecessary the review of other convictions when concurrent sentences have been given. *United States v. Rubin,* 591 F.2d 278, 280 (5th Cir.), *cert. denied,* 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979). The predicate to the application of the concurrent sentence doctrine is the existence of concurrent sentences.[7] Although, for the purpose of sentencing, the trial judge consolidated the four conspiracy counts into one count, this Court is confident that the judge intended to impose concurrent sentences. Indeed, at the sentencing hearing the judge stated:

> The jury found each of you Defendants guilty on these counts and I think that

the evidence is wholesome and adequate to support that verdict if they accepted the government's evidence as they obviously did. And I think that when you take into account all the evidence and not isolate it, but just take all the circumstances, I feel that the evidence is sufficient to support these various findings on these various counts. . . . I am satisfied that the way the matter was submitted to the jury, that the jury had factual evidence before it to make the findings it did beyond a reasonable doubt on each of the conspiracy counts as it was submitted because it was a multicount indictment.

> \* \* \* \* \* \*

> And I am going to sentence you on Counts 3, 4 and 5 and 9, each of the Defendants, that they be placed in the custody of the Attorney General for a period of fifteen years. I am going to sentence a fine of $25,000.00, a fine of $25,000.00 against each of the Defendants.[8] The effect of this is that your sentence is on these counts.

> \* \* \* \* \* \*

> [A]s I understand the law, that is my punishment and the effect of it is that the sentences will, in effect, *be concurrent* as matters now stand in my understanding of the law.

(emphasis added).

The judge further stated that if he thought there were multiple conspiracies he would assess a more severe sentence: "I feel there is just one conspiracy. If I did not feel that way, I would assess a more

---

**7.** The defendants have not argued that the concurrent sentence doctrine is inapplicable to the instant case. Indeed, in their reply brief they state: "At sentencing the trial court did not mean to imply that only one conspiracy existed, but to the contrary that he intended to consolidate the four counts so that the sentence of each could run concurrently. *United States v. Gray,* 626 F.2d 494, 501–02 (5th Cir.1979)" (declining to review the defendant's importation and conspiracy to import convictions for sufficiency of the evidence by invoking the concurrent sentence doctrine), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820, 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346

(1981). An appellate court will not consider *sua sponte* an argument not raised in the court below or urged by the litigants except to prevent a miscarriage of justice. *Hormel v. Helvering,* 312 U.S. 552, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *McKissick v. United States,* 379 F.2d 754, 759 (5th Cir.1967); 28 U.S.C. § 2106; Fed.R.Civ.P. 52(a).

**8.** 21 U.S.C. § 841(b)(1)(A) permits a maximum of 15 years imprisonment and $25,000 fine for violations of §§ 841(a)(1) and 846. Similarly, 21 U.S.C. §§ 960(a)(3) and 960(b)(1) allow a maximum of 15 years in prison and $25,000 fine for a violation of §§ 959 and 963.

severe sentence against you gentlemen.... If I am wrong in that, then you are very fortunate because if I—I· would certainly consider some consecutive sentences in these cases had the law permitted it." It is apparent that the judge consolidated the four counts because of a concern over the single versus multiple conspiracy doctrine and its implications for concurrent or consecutive sentencing.[9] Regardless of the correctness of the judge's interpretation of the single/multiple conspiracy doctrine, his statements at the sentencing hearing leave no doubt that his intent was to impose concurrent sentences.[10]

■ This Court will proceed to review the sufficiency of the evidence to support defendants' conviction on Count 3, which charged a conspiracy to distribute cocaine. In conspiracy cases the Government must prove beyond a reasonable doubt that (1) a conspiracy to accomplish an unlawful purpose existed, (2) the defendant had knowledge of the unlawful conspiracy, and (3) the defendant voluntarily agreed to join the conspiracy. *United States v. Jackson,* 700 F.2d 181 at 185 (5th Cir.1983); *United States v. Pozos,* 697 F.2d 1238 at 1241 (5th Cir.1983); *United States v. Bright,* 550 F.2d 240, 242 (5th Cir.1977). In the instant case, the conspiracy to accomplish the unlawful purpose is plain. Indeed, defendants concede that Benito Montemayor and Salvador

Flores were involved in a conspiracy to distribute cocaine. Defendants allege, however, that they were not willing participants in the conspiracy.

■ The *en banc* Court in *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir. 1980) *(en banc),* cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981) set out the following standards for reviewing the sufficiency of the evidence to support findings of knowledge and joinder (the second and third elements of proof in a drug conspiracy): (1) the Government is not required to prove that the defendant had knowledge of all the details of the conspiracy provided the prosecution establishes defendant's knowledge of the essentials of the conspiracy; (2) a defendant cannot escape criminal responsibility on the grounds (a) that he did not join the conspiracy until well after its inception or (b) that he played only a minor role in the overall scheme. In evaluating a claim of insufficient evidence, we must consider the evidence in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and resolve all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Juarez,* 566 F.2d 511, 513 (5th Cir.1978). The standard of review for sufficiency of the evidence is whether a reasonable trier of fact could have found that the evidence

**9.** The judge indicated that he was particularly concerned about (1) the possibility that counts 4 and 9 (conspiracy to distribute heroin and conspiracy to manufacture and distribute heroin) were basically the same charge and (2) the teachings of *United States v. Marable,* 578 F.2d 151 (5th Cir.1978). This Court in *Marable* found that the double jeopardy clause barred prosecution of the defendant for conspiracy to possess cocaine with intent to distribute following a conviction for conspiracy to possess and distribute heroin. The court found that only one agreement existed based on a discussion of five factors. The court concluded therefore that the cocaine conspiracy charged was the same conspiracy for which defendant Marable had already been convicted. Without engaging in dicta on the implications of the *Marable* decision, this Court notes that, beyond question, consecutive sentences could have been imposed in the instant case for any of the first three counts and Count 9. *See United States v. Rodriguez,* 612 F.2d 906 (5th Cir.1980) *(en*

banc ), aff'd sub nom. *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *United States v. Borchardt,* 698 F.2d 697 at 701–03 (5th Cir.1983). *See also Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

**10.** If any room for doubt did exist, the Judgment and Probation/Commitment Order signed by the trial judge eliminates that doubt. The trial court's "Finding & Judgment" recites:

Defendant has been convicted as charged of the offense(s) of conspiracy to distribute quantities of cocaine, 21:846 and 841(a)(1); conspiracy to distribute quantities of heroin, 21:846 and 841(a)(1); conspiracy to distribute quantities of marihuana, 21:846 and 841(a)(1); and conspiracy to manufacture quantities of heroin, 21:963 and 959, as charged in Counts 3, 4, 5 and 9 of the Indictment, respectively.

established guilt beyond a reasonable doubt. "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (*en banc*).

█ Applying these standards to the instant case we conclude that the evidence is sufficient to sustain a verdict of guilty for conspiracy to distribute cocaine. Concerning the second element of proof, knowledge of the unlawful conspiracy, the "aggregate of the evidence" is more than sufficient to establish that defendants "knew that criminal activity was afoot." [11] *See Alvarez,* 625 F.2d at 1198. The jury could have reasonably believed Bowman's testimony that defendants observed, if not assisted in, the loading of the fender wells of the Blazer with cocaine or money related to cocaine; that they weighed and packaged cocaine on the pool table in the guesthouse in McAllen; that, armed with shoulder bags, they conducted a drug-related meeting for two hours behind locked doors in Benito's bedroom; that they discussed cocaine deals during the meetings at the Monterrey brothel. Concerning the third element of proof, that the defendants voluntarily agreed to join the conspiracy, a jury might easily have concluded that defendants agreed to join the illegal conspiracy from Bowman's testimony that in the Monterrey brothel, both defendants gave their approval to a cocaine deal—that they agreed it was a "good deal." This Court therefore affirms defendants' convictions for conspiracy to distribute cocaine.

█ Having affirmed the convictions on Count 3, the concurrent sentence doctrine is invoked to decline review of defendants' convictions on the remaining three counts.[12] In *United States v. Rubin,* 592 F.2d at 280, this Court held that a court may not apply the doctrine if there is a significant likelihood that the defendant will suffer adverse collateral consequences, *e.g.,* parole consequences, from the unreviewed convictions. In order to obviate any possible adverse consequences, this Court has on several occasions chosen to vacate the unreviewed convictions. *See United States v. Niver,* 689 F.2d 520, 531 (5th Cir.1982); *United States v. Morisse,* 660 F.2d 132, 137 (5th Cir.1981); *United States v. Cardona,* 650 F.2d 54, 58 (5th Cir.1981). The circumstances under which this Court opted to vacate the unreviewed sentences in *Cardona* and *Morisse* are very similar to the circumstances of the instant case—challenges to the sufficiency of the evidence of the unreviewed convictions in drug cases. In the case at bar vacating the unreviewed convictions on Counts 4, 5, and 9 in no way alters the jury's verdict or the convictions themselves. The effect of this judicial action is to suspend imposition of the sentences.[13] No need of the Government is impaired; at the same time, no possibility of adverse collateral consequences to defendants exists. *See Cardona,* 650 F.2d at 58.

### III. *Other Allegations*

#### A. *Coconspirator Hearsay Statements*

█ *United States v. James,* 590 F.2d 575 (5th Cir.) (*en banc*), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979) predicates admission of coconspirators' hearsay statements against a conspirator-defendant on proof of the existence of a conspiracy and the defendant's connection with it, *i.e.,* the coconspirator and the de-

---

**11.** This Court is well aware that mere presence and association with those participating in a conspiracy is insufficient to sustain a verdict of guilt. *United States v. Escobar,* 674 F.2d 469, 478 (5th Cir.1982). More than mere presence has been established in the instant case.

**12.** The concurrent sentence doctrine serves the interests of judicial economy.

**13.** The Government might at some later date ask that the sentences be reimposed "in the interests of justice." In such event, the convictions would then be subject to appellate review. *See United States v. Cardona,* 650 F.2d at 58.

fendant were members of the conspiracy and the statements were made during the course and in furtherance of the conspiracy. The defendants claim that *James* requires the district court to make this determination out of the hearing of the jury prior to admission of any such statements, and that the district court erred in allowing the Government to elicit such evidence from Bowman subject to later satisfaction of the predicate. The defendants are mistaken. The *James* court stated:

> The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator. If it determines that it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up.

*Id.* at 582. The district court did not err in allowing admission of Bowman's hearsay statements subject to later connection. At the close of Bowman's testimony, the court found that the *James* requirements were satisfied. The court's *James* finding is not clearly erroneous.

B. *Defendants' Motion to Dismiss the Indictment, Motion for a Bill of Particulars, and Motion for Disclosure of Grand Jury Transcript*

 The indictment charged that the conspiracies ran from January 1, 1970 to the filing of the indictment (Nov. 17, 1981). The evidence at trial implicated Meynardo and Manuel in the conspiracies from the summer of 1977 and the fall of 1977, respectively.[14] Defendants contend that the indictment was insufficient due to the vagueness or open-endedness of the time period alleged for the conspiracies charged in Counts 3, 4, 5, and 9. An indictment is sufficient if it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against him and (2)

enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Furthermore, it is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as the statutory language unambiguously sets out all the elements necessary to constitute the offense. The language used must be sufficient to inform the accused of the specific offense with which he is charged. *Id.* 94 S.Ct. at 2907–08. While not overly precise, the indictment in the instant case was nonetheless sufficient in factual particularity. It clearly set out the elements of the offense, the specific code sections violated, and the names of six coconspirators. These elements were sufficient to meet the above requirements.

 In asserting error in the denial of defendants' motion for a bill of particulars, defendants fail to allege surprise that prejudiced the preparation of their defense. *See United States v. Horton,* 526 F.2d 884, 887 (5th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). The purpose of a bill of particulars is to apprise the defendant of the charge against him with sufficient precision to enable him to prepare his defense. *Id.* The denial of a bill of particulars is within the sound discretion of the trial judge; this Court can reverse only when it is established that defendant was actually surprised at trial and therefore was prejudiced in his substantial rights. *United States v. Hawkins,* 661 F.2d 436, 451–52 (5th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287, 457 U.S. 1137, 102 S.Ct. 2967, 73 L.Ed.2d 1355, —— U.S. ——, 103 S.Ct. 72, 74 L.Ed.2d 71 (1982). While the time period charged in the indictment could have been delineated with more precision, the indictment adequately put defendants on notice. Indeed, they do not claim prejudicial surprise at trial. The trial judge did not abuse his discretion in denying the bill of particulars.

14. The indictment was meant to provide the basis for prosecution of Benito, Matias, and Reyes Montemayor as well as their brothers and several lesser players. The scope of the

evidence presented at trial may have been narrowed because Matias' trial was severed and Benito and Reyes fugitated.

■ Finally, defendants allege that the judge erred in denying their motion for disclosure of the grand jury transcript pursuant to *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). *Dennis,* however, requires the defense to make a showing of "particularized need" in order to have access to the grand jury testimony of a trial witness. *Id.* 86 S.Ct. at 1849. First, defendants here did not even attempt to demonstrate a particularized need. They merely alleged that the grand jury testimony was hearsay and misleading. In fact, defendant Meynardo's attorney even admitted there was "possibly nothing useful in the grand jury testimony." Secondly, *Dennis* dealt with the right of a defendant to examine the grand jury testimony of a government trial witness; this right is codified in the Jencks Act, 18 U.S.C. § 3500. In the instant case, none of the witnesses called by the Government testified before the grand jury. We affirm the district court's denial of defendants' motion for production of the grand jury testimony.

## C. *Admission of Scientific Evidence*

■ A DEA chemist, Edwin Albers, testified regarding his analysis of cocaine residue removed from the pool table in McAllen and the compartments behind the taillights of the Chevrolet Blazer. First, defendants argue that this evidence should have been excluded because they were not given adequate warning that it would be introduced and therefore were taken by surprise. Defendants claims of surprise are not well-founded. Two weeks before trial the Government agreed to allow defendants access to the pool table to obtain their own samples for independent testing, as the sample of the material recovered by the DEA chemist had been entirely consumed in the course of chemical analysis to determine the presence of cocaine. Defendants failed to take advantage of this opportunity to conduct their own vacuum sweep on the pool table. In fact, ten days before trial began, defendants had contacted a chemist to be on call. Furthermore, the DEA-7

report (the chemist's report) was available throughout discovery under the Government's "open file" discovery provided in the case. Moreover, it is evident from defendants' motion to suppress that they had in fact seen the chemist's report by the first day of trial on January 26, 1982. It is true that defendants did not receive a copy of the spectra from the mass spectrometer test (run on both the sample from the table and the Blazer) until after the DEA chemist testified. During the trial, however, the judge held Albers overnight in the event that defendants should desire that their own expert analyze the spectrograph reports. Defendants failed to do so. Nor did they request a continuance for this purpose. *See United States v. Bockius,* 564 F.2d 1193, 1196–97 (5th Cir.1977). Although defendants' claims of actual surprise may perhaps have more validity in the case of the residue from the Blazer, this evidence was largely cumulative of the evidence based on the residue from the pool table. Additionally, the DEA-7 report on the residue from the Blazer was available to defendants through the Government's "open file" discovery. Defendants have failed to establish surprise that prejudiced them in the presentation of their case through any delay of production of the chemist's reports or the spectra.

■ Second, defendants contend that Albers' testimony should have been excluded because defendants were denied samples of the material recovered by the DEA chemist from the pool table and the Blazer in violation of Fed.R.Crim.P. 16(a)(1)(C). Albers testified that there was no substance whatsoever left following the two tests performed on the material from the pool table (gas chromatograph and mass spectrograph); the only materials remaining after the two tests on the sweepings from the Blazer were lint, dirt, and residue from which all the cocaine had been extracted. Thus, the samples which were vacuumed from the pool table and the Blazer were entirely consumed by testing. Defendants' motion to suppress Albers' testimony [15] based on the Government's failure to pro-

15. Their motion was made before Albers took the stand.

vide a sample of the vacuumed material was therefore denied by the trial judge. The trial court concluded that since there was nothing the Government could provide, given that it had been necessary to use everything the Government had to conduct its own test,[16] the defendants could not be unfairly prejudiced on that account. This Court will not embark on a discussion of whether the substances were even discoverable under Fed.R.Crim.P. 16(a)(1)(C).[17] Assuming, *arguendo,* that the substances were discoverable, the issue would be whether the lack of the vacuumed material requires reversal because it would have been likely to change the verdict. *United States v. Gordon,* 580 F.2d 827, 837 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978) & 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1979). An important factor to consider in resolving this issue is whether the evidence was crucial to a determination of the guilt or innocence of the accused. *Id.* In the instant case, the judge dismissed all the substantive counts against defendants—it was only the conspiracy counts that went to the jury. Defendants could have conspired to distribute cocaine although they were entirely mistaken in the belief that the substance they had was actually cocaine. We conclude that the Government's failure to provide samples of the materials to defendants was not reasonably likely to have affected the verdict and that defendants, therefore, suffered no prejudice.

### D. *Repolling the Jury*

Finally, defendants claim that the Court erred when it repolled the jury to determine if the guilty verdicts were unanimous as to each of the three defendants. The jury returned a verdict of guilty as to all three defendants—Manuel, Meynardo, and Alifonso Arredondo. At the request of defense counsel, the district court polled the jury following the taking of the verdict. One of the jurors responded, "No, that is not my verdict . . . but I went along." At that point, someone noticed that the court reporter was not present. The court reporter was then brought in and the jury was repolled. This time, each juror was asked if he or she was in agreement with the verdict as to each of the three defendants separately. Each juror responded affirmatively, except the juror who had equivocated on the first polling. This juror, however, equivocated only as to co-defendant Arredondo. She specifically affirmed her belief that both Manuel and Meynardo Montemayor were guilty. The district court did not err in finding exactly which guilty verdict the equivocating juror found troublesome. As the Government states in its brief, to fault the Court for determining this fact is to blame the messenger for the message.

### IV. *Conclusion*

We AFFIRM the conviction for conspiracy to distribute cocaine as to both defendants. The convictions on the remaining three counts are VACATED as to both defendants.

---

**16.** The judge also pointed out to defendants that there could be no unfairness if the defense could obtain its own sweepings. As previously noted, defendants did not take the opportunity to do so.

**17.** Given that the substances had been consumed through testing, the Government may not have been in "possession" of the substances within the meaning of the rule.