UNITED STATES of America, Plaintiff–Appellee,

v.

Lucy MARRERO, Defendant–Appellant.

No. 89–1387.

United States Court of Appeals, Fifth Circuit.

June 18, 1990.

Rehearing and Rehearing En Banc Denied July 19, 1990.

Frank Maloney and S. Belinda Wright, Maloney, Yeager & Autry, P.C., Austin, Tex., for defendant-appellant.

Thomas L. Kolker, Austin, Tex., for Amicus, American Civ. Liberties Union.

Dan H. Mills, Austin, Tex., LeRoy Morgan Jahn, W. Ray Jahn, and Philip Police, Asst. U.S. Attys., and Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before KING, JOHNSON and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Lucy Marrero appeals her convictions and sentences for presenting false insurance claims to an agency of the United States and for theft of government proper-

ty having a value in excess of $100.00. For the reasons cited herein, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Lucy Marrero, who holds a doctorate degree in psychology, established a private practice as a consulting psychologist on a part-time basis in Austin, Texas in 1981. Marrero's offices were opened under the name Psychotherapy and Industrial Research Institute; however, the name was later changed to Psychotherapy Institute (hereinafter the Institute). At the Institute, Marrero treated patients from nearby Bergstrom Air Force Base who were insured by the Civilian Health and Medical Program of the Uniform Services (hereinafter CHAMPUS).[1] For those patients who were covered by CHAMPUS, Marrero, through the Institute, submitted claims to CHAMPUS for services rendered. Payment on the Institute's CHAMPUS claims was based on the time spent in the counseling session, the type of therapy involved, and whether the particular therapist held a masters or a doctorate degree. During the period of time relevant to this appeal, CHAMPUS paid for up to sixty minutes of individual therapy at the rate of $82.50, up to ninety minutes of ordinary family therapy at the rate of $126.00, and at the rate of $137.80 for up to ninety minutes of conjoint marital therapy. A session lasting between thirty-one and sixty minutes was paid at the hourly rate whereas a session lasting between sixty-one and ninety minutes was paid at the ninety minute rate.

Marrero experienced a rapid growth in her practice at the Institute and consequently, in 1982, began hiring additional therapists. By the end of 1983, Marrero had employed some ten to fifteen therapists at the Institute and was submitting approximately 600 CHAMPUS claims every month. After the intake process, which was typically conducted either by Marrero or an associate, had been completed for a particular patient, the Institute's therapists would conduct ongoing counseling sessions in the patient's home, at the Institute, or, on certain occasions, at the patient's office.

Therapists at the Institute kept time cards, referred to as "provider cards." Provider cards ostensibly reflected the name of the patient and the date, nature, and length of all therapy sessions conducted. Regardless of the type of session conducted, Marrero instructed the Institute's therapists to record their sessions as family sessions, billable at the higher rate, if the family was eligible for that type of therapy and any family member other than the identified patient was seen at any session.[2]

---

1. CHAMPUS is a health benefit program for active duty and retired service members and their dependents and is administered through contracts between the Department of Defense and private carriers.

2. Other of Marrero's allegedly improper billing practices were as follows:
   a. Initial Consultations: CHAMPUS was to be billed "automatically" for a four-hour session on initial consultations with new patients regardless of the amount of time spent in this session.
   b. Doubling the Number of Counseling Sessions: Using the provider cards submitted by the therapists, the clerk was to record the date of each actual session with the patient on the claim form and then "make up" a date for another session, recording one session on the claim form as individual therapy and one as family or conjoint marital therapy. The clerk was not to pick a date that fell on a Sunday or holiday for the fictitious session. Nor could the clerk use the same date that therapy was actually rendered to the patient for the fictitious session because Marrero said that

CHAMPUS would not pay for more than one counseling session per day. Further, the clerks had to ensure that the "made-up" visits did not result in billing for more than two counseling sessions within seven days, again because CHAMPUS would not pay for them.
   c. Adding Minutes to Counseling Sessions: Minutes were to be added to family and conjoint marital counseling sessions of less than one hour in duration to bring the length of the session to over 60 minutes to ensure payment for the session at the 90 minute rate. Individual therapy sessions were to be billed as lasting more than 30 minutes to ensure payment at the 60 minute rate.
   d. Services Provided to Active Duty Service Members: Services rendered to active duty military personnel—none of whom would be eligible for CHAMPUS benefits—were to be billed in the name of a family member.
   e. Ph.D. Providers: The insurance clerk was informed of which therapists held Ph.D. degrees as opposed to Masters degrees. The clerk was to indicate that a therapist who held a Ph.D. provided the counseling service to the

The Institute's therapists periodically submitted their provider cards to Marrero and were paid by Marrero on the basis of the hours they actually spent with the patients as reflected on the provider cards, receiving between twenty and forty dollars an hour for conducting the counseling sessions.

The Institute's therapists were not privy to and did not complete the claim forms which Marrero submitted to CHAMPUS. Instead, the forms were kept by Marrero. Initially, the claim forms were completed and submitted to CHAMPUS by either Marrero or her sister, Debra Thompson. Later, however, Marrero employed insurance billing clerks at the Institute whose responsibility was the preparation, completion and filing of CHAMPUS claim forms.

As Marrero's practice continued to flourish and as the billing system became more comprehensive, Marrero was compelled to selectively divulge the details of her system. In the latter part of 1983, Marrero personally gave a new insurance billing clerk at the Institute, Beverly King, instructions regarding the procedure King was to use when completing and submitting CHAMPUS claims—instructions on which King took notes. Marrero gave King explicit instructions to refrain from discussing the Institute's "insurance" matters with any one else.[3] At one point during the period covered by the indictment, Marrero required King to keep the Institute's insurance records at King's home. Marrero kept patient files in a locked storage cabinet at the Institute.

As mentioned previously, the Institute's therapists generally did not see the completed claim forms submitted to CHAM-

PUS. Instead, Marrero obtained the therapists' consent for Marrero and her office staff to sign the claim forms for them.[4] The claim forms were mailed by the clerks when Marrero so instructed, and Marrero would check to see if they had been mailed and when. The Institute's therapists were paid on the basis of the actual number and duration of counseling sessions as reflected on provider cards, not for the duration and number of sessions for which CHAMPUS claims were filed.[5]

In January 1984, Marrero asked Gary Marks (hereinafter Marks), who holds a doctorate degree in computer science, to design a computer program to implement the billing procedures discussed above. Marks questioned Marrero's billing practices and refused to design the program. Shortly thereafter, Marrero asked Robert Conrad (hereinafter Conrad), a sales manager for an Austin computer company, to assist her in submitting backlogged CHAMPUS claims and to design a computer program to automate the Institute's billing system. Conrad was reluctant to bill in the fashion Marrero had indicated and instead suggested that the computer billing program be designed to generate a list of appointment dates which would be submitted to the individual therapists to confirm whether the designated counseling sessions had actually been conducted. Marrero rejected the idea and insisted that patients rarely cancelled appointments. Conrad's suggestion of the verification procedure would turn out to be the end of his relationship with Marrero; Conrad left the Institute before completing the billing system.

patient if the actual service provider was a Masters-level therapist. This entitled the Institute to be paid at a higher Ph.D. rate.
f. Payroll Accounting: The clerks were to keep up with the actual appointments for payroll purposes to ensure that the Institute only paid its therapists for the services actually rendered.

**3.** In October of 1983, when King received these instructions, Marrero had already been confronted by one of her therapists, Dr. Dooley, about the impropriety of the billing practices that she directed King to adopt.

**4.** Early on in Marrero's practice, the therapists were asked to sign the claim forms in blank.

**5.** All of the submitted claims were paid by CHAMPUS by check made payable to the Institute, deposited in Marrero's bank account, and negotiated to her use and benefit; all were for amounts over $100. If a check issued by CHAMPUS was made payable to a particular therapist, the check was returned to CHAMPUS on Marrero's instructions, with a request that another check payable to the Institute be issued.

On October 1, 1984, Jeanine Gross (hereinafter Gross) received a bill from her insurance carrier for the treatment of her son at the Institute which substantially exceeded the bill she expected. It appeared to Gross that she was being double-billed. Before complaining to Marrero, Gross demanded a copy of the Institute claim forms, which she received. The forms confirmed Gross's suspicions. Gross thereafter confronted Marrero and Marrero agreed to change the billings.

Thereafter, the impropriety of Marrero's billing scheme continued to manifest itself, and on June 7, 1988, a federal grand jury indicted Marrero with twenty-one counts of presenting false claims to CHAMPUS, an agency of the United States, in violation of 18 U.S.C. § 287 (counts 1–21) and twenty-one counts of theft of government property having a value in excess of $100.00 in violation of 18 U.S.C. § 641 (counts 22–42). Four families who were treated at the Institute and whose treatment forms the basis for the indictment are the Beckers (counts 1–4 and 22–27), the Odoms (counts 20–21, 41–42), the Gaddises (counts 5–15 and 30–37) and the DeKays (counts 16–19 and 38–40).

At the ensuing trial, evidence was introduced that the actual services rendered to the above four families were inconsistent with the services reflected on claim forms which had been submitted to CHAMPUS by Marrero through the Institute. The evidence also showed, among other things, that CHAMPUS had been billed for twice-weekly sessions—one individual therapy session and one family therapy session—even when those sessions did not actually take place. Further, it was also shown that the time billed by the Institute for therapy sessions often exceeded the time the patient actually spent in the session. The jury was told that one of Marrero's therapists, a Dr. Dooley (hereinafter Dooley), in August 1983, had become aware of the irregularities in the Institute's billing system and had confronted Marrero. Marrero told Dooley she would remedy the situation. Marrero thereafter remedied the situation by instructing her insurance clerk not to bill Dooley's patients in accordance with the usual billing procedure. Marrero, however, did instruct the clerk to bill all of Dooley's sessions as family therapy even when the sessions consisted of only individual therapy.

A jury convicted Marrero on seventeen counts of presenting false claims to an agency of the United States and on twenty counts of theft of government property. Marrero was sentenced to concurrent terms of five years' imprisonment on the presenting false claim counts and concurrent terms of seven years on the theft of government property counts. The sentences on the theft counts were to run consecutively to the sentences imposed on the false claims counts. Thus, Marrero's total term of imprisonment was twelve years. Marrero was also fined $150,000.00 and ordered to pay a $50.00 special assessment on the one count to which 18 U.S.C. § 3013 was applicable. Restitution was to be paid in accordance with the resolution of the pendent civil proceeding. Thereafter, Marrero timely filed the instant appeal.

## II. DISCUSSION

### A. Sufficiency of Evidence

Marrero challenges the sufficiency of the evidence supporting her convictions. To evaluate a challenge to the sufficiency of the evidence, the evidence adduced at trial is viewed in the light most favorable to the verdict with all reasonable inferences and credibility choices made in support of it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Romero–Reyna*, 867 F.2d 834, 835 (5th Cir.1989). This Court is constrained to affirm the convictions if the evidence, when viewed in this light, is such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Molinar–Apodaca*, 889 F.2d 1417, 1423 (5th Cir.1989).

Marrero maintains that the evidence adduced at trial shows that the Institute's billing system was a well intentioned sys-

tem which was simply not error free. In support of this contention, Marrero asserts that the general pattern of services for clients at the Institute was conducted pursuant to the well-recognized "systems approach" to psychotherapy and consisted of two sessions per week—one individual and one family. Marrero emphasizes that this two session per week modality was prescribed for most patients and appointments were set up accordingly. Marrero asserts that the Institute's billing system would automatically record two sessions unless the assigned therapist communicated a "no-show" to the billing personnel. Absent any such notification or special instructions, the billing automatically followed the scheduled pattern of services. This system, according to Marrero, was not error free but neither was it criminal.

In further support of her argument that the evidence was insufficient to support her convictions, Marrero contends that the testimony of Beverly King, Marrero's insurance clerk, regarding Marrero's billing instructions was not credible. Moreover, Marrero emphasizes that she (Marrero) testified to a lack of criminal intent on her part and that forty-four character witnesses testified on her behalf. Marrero argues that, faced with such evidence, a reasonable jury could not have found that Marrero knew she was submitting false claims to the Government. Marrero further contends that no reasonable jury could have found that Marrero intended to deprive the Government of the use and benefit of its money; instead, Marrero argues that the evidence merely shows mistake or accident.

For the following reasons, we are constrained to reject Marrero's arguments. First, Marrero's position on this issue is based largely on her assessment of the credibility of various witnesses, and to the extent her argument is so based it must fail since credibility determinations are within the sole province of the jury. *United States v. Molinar–Apodaca,* 889 F.2d 1417 (5th Cir.1989). Moreover, this Court is bound to accept credibility determinations made by the jury unless the chal-

lenged testimony "is so unbelievable on its face that it defies physical laws." *United States v. McKenzie,* 768 F.2d 602, 605 (5th Cir.1985), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986) (citations omitted). On the facts presented by this record, we cannot so conclude.

Second, the record in this case contains ample evidence to support the jury's determination that Marrero possessed the requisite intent for conviction under sections 287 and 641. More specifically, the evidence shows that Marrero knowingly and willfully devised a billing system which resulted in the filing of claims for services that were not in fact rendered. Moreover, the evidence supports the conclusion that Marrero intentionally left the system intact after the propriety of the system was specifically challenged by Dooley and other individuals. Marrero's refusal to remedy the problems was no doubt particularly troubling to the jury in light of evidence which showed that Marrero had the information to correctly bill clients for the actual services rendered.

In sum, we are unpersuaded by Marrero's contentions which, in our view, are essentially an attempt to convince this Court to give effect to Marrero's characterization of the evidence, and in so doing, reject the jury's credibility determinations.

### B. *Bill of Particulars*

Shortly before trial, Marrero requested that the district court instruct the United States to file a bill of particulars. The request sought the identification of the particular part of each claim which the Government contended was false, the specific dates of the allegedly false claims, and any other particular which the Government claimed was false. Additionally, in connection with the theft of government property counts, Marrero sought to learn the Government's theory concerning which portions of the claims were fraudulent and the identification of the specific amount of money which the Government contended had been stolen in connection with each

claim.[6]

■ This Court reviews a district court's denial of a motion for a bill of particulars under an abuse of discretion standard. *United States v. Vasquez*, 867 F.2d 872, 874 (5th Cir.1989). In order to prevail on a challenge to the district court's denial of a motion for a bill of particulars, the defendant must establish actual surprise at trial and demonstrate prejudice to his substantial rights. *United States v. Montemayor*, 703 F.2d 109, 117 (5th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). Moreover, when the information requested is provided to the defendant in some other form, no bill of particulars is required. *Vasquez*, 867 F.2d at 874 (citation omitted).

■ Marrero admits that, during discovery, she obtained from the Government the dates of treatment the Government alleged to be false in connection with each claim and the general nature of the fraudulent scheme. Nevertheless, Marrero here alleges four specific instances of actual surprise at trial. Marrero asserts that the Government did not adhere to the dates as the basis for the falsity of the bogus claims but interjected other bases including: (1) inflation of the amount of time of therapy sessions; (2) fraudulent signatures on claim forms; (3) billing CHAMPUS at rates higher than those charged private insurance providers; and (4) misrepresenting the qualifications of therapists as providers on claim forms. She claims that confusion of the issues resulted and that she was prejudiced thereby.[7]

We reject Marrero's contentions and conclude that she has not made an adequate showing of surprise or prejudice on the facts of this case. At trial, Marrero's counsel never claimed surprise, failed to object

to the testimony which is now challenged on appeal, made no requests for continuances, and did not move to strike the now challenged testimony. With respect to Marrero's claims that she was surprised by the allegation of fraudulent signatures on the claim forms, Marrero cannot complain of such evidence since Marrero's own counsel developed this evidence during direct examination. As to the evidence concerning Marrero's billing CHAMPUS at a different rate and misrepresenting the degree qualifications of therapists, this testimony was developed within the proper scope of cross-examination of Marrero's own witnesses who had testified on direct examination about CHAMPUS billing regulations. With respect to the allegations that Marrero inflated the time duration of therapy sessions at the Institute, we note that each particular claim number was identified in the indictment and Marrero's own records show the disparity in time served and time billed. Moreover, Dooley's notes, which were made available to Marrero during discovery, similarly identify the disparity. Accordingly, we conclude that the district court did not abuse its discretion in denying Marrero's motion for a bill of particulars.

### C. Double Jeopardy

■ Marrero next argues that sections 287 and 641 address essentially the same offense and, that, therefore she was improperly indicted, prosecuted, and sentenced under both statutes in violation of her fifth amendment right not to be twice punished for the same offense. Marrero contends that the district court abused its discretion by denying her motion to dismiss or alternatively, by denying her Motion to Compel the Government to Elect [between the section 287 and section 641 counts of the indictment]. Marrero's arguments not-

---

**6.** In the indictment, only a claim number and a date, the significance of which was not explained, was provided for each count. The claim numbers related to more than one claim and within any one of the claims pertaining to a claim number there was the possibility of several dates on which services were rendered. The specific date named in the indictment was not necessarily the date the service was allegedly rendered.

**7.** To the extent Marrero contends that she was prejudiced because she was not informed of the exact dollar figure for each count under § 641, her claim is unfounded. The Government is only required to prove amounts exceeding $100 and thus Marrero cannot show prejudice due to this lack of information.

withstanding, the Supreme Court has held that "a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause." *Albernaz v. United States*, 450 U.S. 333, 344 n. 3, 101 S.Ct. 1137, 1145 n. 3, 67 L.Ed.2d 275 (1981) (citations omitted). The question is simply whether Congress intended to impose multiple punishments for the two crimes. *Id.* at 344, 101 S.Ct. at 1145.

■ The Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), set forth the basic test used to determine congressional intent. The test is whether each offense contains an element not found in the other. *Id.* at 304, 52 S.Ct. at 182. This test "calls for comparison of the statutorily-prescribed elements of the offenses, not the constituent facts either as alleged or proven" *United States v. Coachman*, 727 F.2d 1293, 1301 (D.C.Cir.1984) (footnote omitted). Both section 287 and section 641 require proof of an element the other does not. Section 287 requires proof that a false claim was submitted while section 641 does not, and section 641 requires proof of a conversion—that the defendant gained control of the government property—but section 287 does not. *See id.* at 1302 (holding that section 287 and section 641 are not the same offense). Accordingly, we reject Marrero's double jeopardy argument and conclude that the district court did not abuse its discretion in denying Marrero's Motion to Dismiss and her Motion to Compel the Government to Elect.

### D. *Extrinsic Offense Evidence*

■ Under *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), extrinsic offense evidence is admissible under Fed.R.Evid. 404(b) when (1) it is relevant to an issue other than character such as intent or lack of mistake; and (2) the prejudicial effect of the evidence does not outweigh its probative value. Marrero admits that the first

prong of *Beechum* is met, but argues that the prejudicial effect of this evidence outweighed its probative value. Because Marrero's counsel did not object under Rule 404(b) to the extrinsic offense evidence adduced at trial, this Court may reverse the district court's ruling only if the district court committed plain error.[8] *See United States v. Reed*, 670 F.2d 622, 623 (5th Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); Fed.R. Crim.P. 52(b).

■ The extrinsic offense evidence which was admitted by the district court in this case was quite probative. The extrinsic offenses were identical to the charged offenses. Additionally, the extrinsic offense evidence was needed in this case since the offense element it was introduced to prove—intent—was hotly contested at trial. The above conclusions notwithstanding, we are mindful that the danger of prejudice to Marrero was not insignificant because of the similarity of the extrinsic offenses and the charged offenses. Nevertheless, given the fact that Marrero's criminal intent was a primary issue at trial, we are not prepared to conclude that the district court clearly abused its discretion and committed plain error by admitting the challenged extrinsic offense evidence. *See United States v. Vincent*, 648 F.2d 1046, 1051 (5th Cir. Unit A 1981) (the determination to admit or exclude evidence is a matter within the discretion of the trial court and subject to reversal by the court of appeals only upon a showing of a clear abuse of discretion).

### E. *Exclusion of Marrero's Character Evidence*

■ Marrero sought to prove that her good character was inconsistent with criminal intent by introducing evidence of specific acts of good character. Marrero contends that she sought to introduce evidence which showed that she provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge. Under Fed.

---

**8.** Marrero's trial counsel objected on the basis of relevancy, materiality and the Government's alleged failure to provide the challenged evidence during discovery.

R.Evid. 405(b) specific acts are only admissible "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense...." Marrero argues that the evidence she proffered was essential to her defense of lack of motive or intent. As with the admission of extrinsic offense evidence, we review the district court's ruling regarding the exclusion of character evidence against an abuse of discretion standard. *United States v. Vincent*, 648 F.2d 1046.

■ For the following reasons, we reject Marrero's contentions. Marrero's character in this case was simply not an essential element of the charges against her. Moreover, with respect to Marrero's defenses of lack of intent and lack of motive, Marrero sought at trial to use specific acts circumstantially to prove lack of intent. Such a tactic is not only disfavored, it is not permitted under Rule 405(b). Additionally, the evidence of specific acts of good character which Marrero sought to admit into evidence was irrelevant to the charges contained in the indictment. *See United States v. Ylda*, 643 F.2d 348, 352 (5th Cir.1981); *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir.1978). The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment. Moreover, the record demonstrates that the district court did, in fact, allow Marrero to introduce substantial evidence of her good character at trial. Accordingly, the district court did not err in disallowing the proffered evidence which Marrero now argues should have been admitted.

### F. *Evidence of Accurate Billings*

■ Marrero next argues that the district court erred in disallowing testimony by an accountant hired by Marrero concerning the results of a survey of Marrero's patients in 1984. In that particular survey, there were ninety-nine patient responses received, seventy-seven of which

attested to the accuracy of the Institute's bills.[9] For the reasons stated above concerning Marrero's challenges to the district court's exclusion of character evidence, we likewise conclude that the court did not abuse its discretion in excluding the survey evidence. Again, it is noted that "[e]vidence of noncriminal conduct [introduced] to negate the inference of criminal conduct is generally irrelevant." *Grimm*, 568 F.2d at 1138.

### G. *Brady Hearing*

Marrero next contends that the results of a Government survey of her patients which reflected that some clients of the Institute were billed accurately should have been made available to Marrero pursuant to her pretrial requests for exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Apparently, Marrero specifically requested the results of the Government survey of her patients because she spoke with at least two former patients who told her that they had provided the Government with written statements to the effect that their bills were accurate. The district court held that the purportedly exculpatory material which Marrero sought, insofar as it was evidence of noncriminal conduct, was irrelevant. On appeal, Marrero asks this Court to remand the case for the district court to conduct an evidentiary hearing to determine whether the exculpatory material exists, and if so, whether it should have been produced for Marrero's benefit.

■ In response to Marrero's contentions, the Government does not contend that it did not possess the survey. Instead, the Government argues (1) that it was not required to disclose the sought information under *Brady* because it was irrelevant and, (2) that there was no duty to disclose the results of the Government survey because this information was readily available to Marrero without the Government's help. We are persuaded that both prongs of the Government's argument on appeal defeat

---

9. Although the survey was sent to all former patients, the actual number of inquiries is not

reflected in the record on appeal.

Marrero's contentions on this issue. While the Supreme Court in *Brady* held that the Government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case. *See United States v. Herbst*, 641 F.2d 1161, 1168 n. 11 (5th Cir.), *cert. denied sub nom. Griffin v. United States*, 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981). This Court has held that "[w]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980) (citations omitted); *see also United States v. Herbst*, 641 F.2d 1161, 1168 n. 11 (5th Cir.), *cert. denied*, 454 U.S. 851, 102 S.Ct. 292, 70 L.Ed.2d 141 (1981). The record in this case demonstrates that Marrero herself contacted former Institute patients and was aware as early as 1984 that an investigation was being conducted. Because the purported exculpatory evidence which Marrero now claims should have been produced by the Government would have resulted from Marrero's interviews with her own patients, the evidence was readily available to her through her own efforts. Thus, we are not prepared to conclude that the district court abused its discretion in disallowing Marrero's *Brady* claim.

### H. *New Trial or Hearing on Jury Misconduct*

The jury returned its verdict on February 17, 1989. Subsequently, Marrero properly obtained the affidavits of two jurors to the effect that (1) a juror stated, in the presence of other jurors, that the defendant was guilty, and (2) that a juror told them during deliberations that the "majority rule" controlled their verdict and that they had to vote with the majority despite their intention of voting not guilty. Marrero timely raised juror misconduct as grounds for a new trial and requested a hearing on the issue. The Government responded with the affidavits of two other jurors. The district court conducted an *ex parte in camera* interview of the four jurors and sealed the record thereof. Marrero's motion to open the sealed record to prepare her appeal was denied.

Federal Rule of Evidence 606(b), the Advisory Committee Notes, as well as the Supreme Court's discussion of Rule 606(b) in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), make it clear that no inquiry is allowed into the jury's process of arriving at a verdict. Consequently, the testimony of the jurors that they were influenced by another juror's statement that majority rule controlled is inadmissible and thus cannot serve as a basis for impeaching the jury's verdict.

The question of whether Marrero was entitled to either a hearing or a new trial on her claim that a juror was biased is more substantial. The Eighth Circuit has held that if a defendant can show actual bias of a juror such that "the juror did not ... decide the case on the basis of an impartial consideration of the evidence," the defendant is entitled to a new trial even when the claim is not raised until after the trial so long as the defendant did not know of the possibility of juror bias during trial. *See United States v. Dean*, 647 F.2d 779, 785 (8th Cir.1981), *rev'd on other grounds*, 667 F.2d 729 (8th Cir.) (en banc) (reversing panel on ground that by failing to bring his knowledge of possible juror bias to the attention of the district court prior to the rendering of the verdict the defendant waived his right to a new trial based on juror bias), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). We have reviewed the record in this case as it pertains to the district court's *ex parte in camera* interview of the jurors in question as well as the actual affidavits of those jurors. The record reveals that the district court was essentially faced with making a credibility determination based on the conflicting testimony given by the jurors *in camera*. After examining the jurors, the district court concluded that the allegations of juror bias were incredible. Since the district court is best suited to make this

type of credibility determination, we are constrained to leave undisturbed the district court's conclusions. Accordingly we reject Marrero's claims of juror bias.

### I. Sentencing

■ Included in Marrero's presentence report was an estimation of the total loss to CHAMPUS caused by Marrero including losses due to fraud which were not charged in the indictment. The estimation was based on an extrapolation from the daily calendar of a particular therapist at the Institute and, according to Marrero, grossly misrepresented the total dollar amount which CHAMPUS paid for the Institute's bogus claims. Marrero argues on appeal that under Fed.R.Crim.P. 32(c)(3)(D) when, as is the case here, the defendant alleges that the presentence report contains a factual inaccuracy, the district court is required to make either (1) a finding in regard to the inaccuracy or (2) a determination that no finding is necessary because the court will not consider the information in sentencing.

We have reviewed the record on this issue and are not prepared to conclude that the sentence, albeit arguably somewhat excessive, was improper. As the Government notes on brief, this Court has held that a district court does not err when the court

> addresses the defendant's arguments and complies with applicable legal limits in a manner that is comprehensible when the sentencing hearing is viewed in the context of the record—including the presentence investigation—as a whole.

*United States v. Lopez–Escobar*, 884 F.2d 170, 173 (5th Cir.1989).

In the instant case, the district court listened to and addressed Marrero's arguments on the extrapolation issue. The district court acknowledged that the exact amount of money which Marrero and the Institute fraudulently extracted from CHAMPUS was essentially unascertainable. The record, when read in its entirety, leads us to conclude that the district court was well aware that the extrapolated amount was not precisely accurate and further, that the district court's sentencing

determination was not based on any exact extrapolated amount. Indeed, the district court, at one point during the sentencing proceedings, in response to Marrero's counsel's objections to the extrapolated amount, stated that

> I'm not going to assess a penalty here upon—against Mrs. Marrero on—a monetary penalty on the basis of any figure that's in here that I'm aware of.... I know there is a loss. I think it's substantial, but I don't know exactly what it is.

In light of this and related statements made by the district court during sentencing proceedings, we are constrained to reject Marrero's contentions that the district court improperly relied on an allegedly inaccurate calculation of damages in imposing sentence.

■ Finally, Marrero assigns error to the district court's *ex parte* contact with a physician regarding Marrero's health. The record, however, indicates that the district court asked the probation officer to investigate Marrero's health after both Marrero's husband and her physician wrote to inform the district court that Marrero was seriously ill. Acting on the district court's request, the probation officer solicited and received the letter at issue from another treating physician. The other physician was not a party to the litigation and the district court was not bound to avoid presentence contacts with the United States Probation Office, an arm of the court. *See United States v. Houston*, 745 F.2d 333, 334 (5th Cir.1984), *cert. denied*, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 388 (1985). Accordingly, Marrero's last assignment of error is without merit.

### III. CONCLUSION

The evidence adduced at trial was sufficient to support Marrero's convictions. The district court's evidentiary rulings and the denial of Marrero's motion to compel the Government to file a bill of particulars were not erroneous. Marrero's constitutional double jeopardy rights and *Brady* rights were not violated by the district court. The district court did not abuse its

discretion in denying Marrero's motion for a new trial based on jury misconduct. Finally, the sentence imposed by the district court was not improper. The convictions and sentences are affirmed.

AFFIRMED.