United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 28, 2005**

Charles R. Fulbruge III
Clerk

REVISED JANUARY 25, 2006

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 05-70007

_____

ROY LEE PIPPIN

                    Petitioner - Appellant

v.

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

                    Respondent - Appellee

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before KING, Chief Judge, and HIGGINBOTHAM and PRADO, Circuit
Judges.

KING, Chief Judge:

    Petitioner-appellant Roy Lee Pippin seeks a certificate of
appealability (COA) to appeal the district court's summary
judgment dismissal of his petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254.  Because Pippin cannot make a
substantial showing of the denial of a constitutional right, we
DENY his application for a COA.

## I.  BACKGROUND

    Pippin owned and operated an air conditioning business known

-1-

as Pippin Services.  In December 1993, Pippin became involved in a money laundering scheme to funnel proceeds from the sale of Colombian cocaine in the United States to Mexico, using air conditioners and modified gas tanks of trucks to transport large sums of money across the Mexican border.  When approximately $2 million in drug proceeds was reported missing, Pippin rented a white panel van from PV Rentals and reserved two rooms at a Motel 6 on April 27, 1994.[1]  At Pippin's request, Abraham Pacheco, an employee at Pippin Services, took two men, Elmer Buitrago and his cousin, Fabio Buitrago, to the Motel 6 and held them captive against their will for several days.[2]  Before dawn on May 4, 1994, Pippin and Pacheco took Elmer and Fabio Buitrago to a warehouse in the rented van.  Pippin then shot them each approximately four times through a pillow to muffle the sound, and both men then left the warehouse to get rid of the murder weapon.  Shortly thereafter, Houston Police Officer Eddie Parodi, responding to a call of criminal mischief in progress at the apartment complex located directly behind the warehouse, arrived

---

[1]     Pippin's immediate supervisor in the money laundering scheme was a man identified in the record as "Alfredo."  When the missing money was discovered, Pippin apparently proceeded with the kidnapping plot under direct orders from Alfredo.

[2]     The record shows that Pippin paid $500 per shift to three employees from his air conditioning business (Aaron Loweth, Flavio Salazar, and Jorge Pulido) to assist in holding the two men captive.  Although Pippin and his wife stayed in the next room for a short time, Pippin would generally only visit the hotel to monitor the situation and occasionally bring food, beer, and drugs to the captors.

at the scene and found the fatally wounded Elmer Buitrago crying out in English and Spanish for help.[3]

Before the ambulance arrived, Buitrago spoke with Officer Parodi and identified Pippin as the shooter. Buitrago described Pippin as a white male, approximately 5'9" and 200 pounds, with sandy brown hair.[4] Buitrago also claimed that after Pippin shot him in the warehouse, he was able to hit Pippin with a pipe and escape. Garza later testified that he also heard Buitrago say "Pippin shot me" and mention the name "Roy." Buitrago died later that day at the hospital from his gunshot wounds. The body of Fabio Buitrago was not discovered until the next day, when Lieutenant Richard Maxey returned to the warehouse to obtain statements from witnesses. Upon further investigation, the police found eight fired nine-millimeter cartridge cases from a semiautomatic weapon on the right side of the room and some bullet holes and fired bullets lodged in the north wall of the warehouse.

Law enforcement officers arrested Pippin on June 28, 1994 at a friend's house. At his trial, Pippin admitted to participating

---

[3]     Warren Garza, a security guard on duty at the apartment complex at the time, assisted Officer Parodi in finding the source of the commotion that resulted in the calls from concerned residents. Before Officer Parodi arrived at the scene, Garza had noticed two men fitting the physical descriptions of Pippin and Pacheco driving around the apartment complex in a white van.

[4]     Pippin is a white male with sandy brown hair. At trial, he testified that he is approximately 6'1" and weighs between 210 and 220 pounds.

in the aggravated kidnappings of Elmer and Fabio Buitrago but denied killing any of them or even being present when they were killed. Charles Anderson, a ballistics expert for the Houston Police Department, testified about a ballistics report he prepared regarding the bullets and cartridge cases found at the crime scene. Both the prosecutor Julian Ramirez and Pippin's defense attorneys Richard Wheelan and Joan Campbell had access to Anderson's report well in advance of the trial.

On September 15, 1995, Pippin was convicted of capital murder for intentionally killing more than one person during the same criminal transaction, and for killing Elmer Buitrago during the course of a kidnapping. Despite the presentation of mitigating evidence during the punishment phase of his trial,[5] Pippin was sentenced to death. The Texas Court of Criminal Appeals affirmed his conviction and sentence. Pippin v. State, No. 72,252 (Tex. Crim. App. May 21, 1997).

Pippin filed his original state habeas corpus petition on May 18, 1998. On July 11, 2001, he filed a second petition and supplemental memorandum of law raising several new claims. On August 3, 2001, the state trial court entered an order construing

---

[5] Pippin's mitigating evidence primarily consisted of the testimony of his ex-wife and her mother that he was not a violent person. Dr. Walter Quijano, a clinical psychologist, also testified that some studies demonstrate that violent behavior decreases with an inmate's age. Pippin does not challenge the trial court's admission of mitigating evidence at the punishment phase in his request for a COA.

-4-

both the second application and the supplemental memorandum as successive petitions. In a per curiam order issued on February 20, 2002, the Texas Court of Criminal Appeals expressly adopted the trial court's findings and conclusions, denied Pippin's first petition on the merits, and dismissed the other two as abuses of the writ. Ex parte Pippin, Nos. 50,613-01, -02, -03 (Tex. Crim. App. Feb. 20, 2002) (unpublished). The Supreme Court of the United States subsequently denied Pippin's petition for a writ of certiorari on October 7, 2002. Pippin v. Texas, 537 U.S. 845 (2002).

On June 21, 2002, Pippin filed his original federal habeas petition in the District Court for the Southern District of Texas. The district court subsequently granted Pippin's motion for appointment of new counsel on December 13, 2002, which resulted in an amended petition that was filed on May 14, 2003. In two separate memoranda and orders, issued on November 23, 2004 and January 25, 2005, respectively, the district court granted the respondent's motion for summary judgment to deny habeas relief and sua sponte declined to issue a COA.[6]

_____

[6] In the first memorandum and order, the district court granted respondent Dretke's motion for summary judgment on twenty-four of Pippin's twenty-six claims. Two claims were preserved for additional limited discovery and supplemental briefing: (1) Pippin's claim that the prosecutor failed to disclose exculpatory evidence and (2) Pippin's claim that the state impaired his right to effective assistance of counsel during the pretrial and jury voir dire by failing to use the ballistics evidence underlying his Brady claim. The second memorandum and order subsequently dismissed both remaining claims

Pippin now asks this court to grant a COA and raises several grounds already rejected by the district court for relief: (1) Pippin was deprived of due process of law because the prosecutor allegedly withheld material evidence concerning the ballistics evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because the trial court failed to instruct the jury on the lesser included offense of felony murder, and because a juror was purportedly inattentive during his criminal trial; (2) Pippin's trial counsel rendered ineffective assistance by failing to adequately examine the ballistics evidence; (3) the trial court denied Pippin's constitutional right to confront adverse witnesses under the Sixth Amendment by admitting the dying declaration of Elmer Buitrago; and (4) the district court erred in refusing to allow Pippin the opportunity to depose the prosecutor Julian Ramirez.

## II.  DISCUSSION

## A.  Standard of Review

Pippin's claim is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA) because he filed his original federal habeas petition under § 2254 on June 21, 2002, after the AEDPA's April 24, 1996 effective date.  <u>See</u> <u>Fisher v. Johnson</u>, 174 F.3d 710, 711 (5th Cir. 1999) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997)).  Under the AEDPA, a state habeas

on summary judgment.

petitioner may appeal a district court's dismissal of his petition only if the district court or the court of appeals first issues a COA. 28 U.S.C. § 2253(c)(1) (2004); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (describing a COA as a "jurisdictional prerequisite" without which "federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners"); Neville v. Dretke, 423 F.3d 474, 478 (5th Cir. 2005). In determining whether to grant a petitioner's request for a COA, the Supreme Court has instructed that a "court of appeals should limit its examination to a threshold inquiry into the underlying merit of his claims." Miller-El, 537 U.S. at 327 (citing Slack v. McDaniel, 529 U.S. 473, 481 (2000)). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." Id. at 336.

A COA will be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2) (2004). In order to meet this standard, Pippin must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484). "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."

-7-

Id. at 336.  Although the issuance of a COA "must not be pro forma or a matter of course," the petitioner satisfies the burden under § 2253(c) by "demonstrat[ing] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Id. at 337-38.  "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."  Id. at 338.  Finally, any doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner.  Medellin v. Dretke, 371 F.3d 270, 275 (5th Cir. 2004) (per curiam); Newton v. Dretke, 371 F.3d 250, 254 (5th Cir. 2004).

In determining whether the district court's denial of Pippin's petition was debatable, we must keep in mind the deferential standard of review that the AEDPA requires a district court to apply when considering a petition for habeas relief. See Brown v. Dretke, 419 F.3d 365, 371 (5th Cir. 2005) ("With respect to the review of factual findings, AEDPA significantly restricts the scope of federal habeas review."); see also Miniel v. Cockrell, 339 F.3d 331, 336 (5th Cir. 2003).  Under the AEDPA, a federal court is not to grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless it determines that the state court's adjudication "resulted in a decision that was contrary to, or

-8-

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision is contrary to Supreme Court precedent if: (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law"; or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405 (2000) (opinion of O'Connor, J.) (interpreting the statutory language "contrary to, or involved an unreasonable application of"). "A state court's decision is an unreasonable application of clearly established federal law whenever the state court identifies the correct governing legal principle from the Supreme Court's decisions but applies that principle to the facts of the prisoner's case in an objectively unreasonable manner." Young v. Dretke, 356 F.3d 616, 623 (5th Cir. 2004) (internal quotation marks omitted); accord Williams, 529 U.S. at 409. "An unreasonable application may also occur if 'the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Young, 356 F.3d at 623 (alteration in original) (quoting Williams, 529 U.S. at 407).

"[A] determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness attaches not only to explicit findings of fact, but also to "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." Pondexter v. Dretke, 346 F.3d 142, 148 (5th Cir. 2003) (quoting Valdez v. Cockrell, 274 F.3d 941, 948 n.11 (5th Cir. 2001)). A writ of habeas corpus may issue if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

## B. Due Process Claims

### 1. The Brady Claim

Pippin asserts that his constitutional rights were violated by the prosecutor's alleged suppression of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). These allegations of prosecutorial misconduct involve the disputed contents of the state's ballistics report in this case. At trial, Houston Police firearms examiner Charles Anderson testified about two sets of bullets; one set was recovered from Elmer Buitrago's body and one set from Fabio Buitrago's body. In addition, Anderson testified about cartridge cases recovered from

-10-

the crime scene.  Anderson testified that the cartridge cases were all fired from the same gun.  He also testified that two of the bullets found in the body of Fabio Buitrago were fired from the gun that fired one of the two bullets found in the body of Elmer Buitrago.  During its case-in-chief, the defense recalled Anderson, who then testified that two of the bullets recovered from Elmer Buitrago came from different guns.  Anderson explained that this fact was not clearly stated in his report, but that he had discussed this discrepancy with the prosecutor before he testified.

Anderson's affidavit stated that the defense ballistics expert Floyd McDonald had access to and examined the bullet fragments before trial.  Both experts concluded that the bullets were fired by two separate guns.  The prosecutor Julian Ramirez has consistently asserted that he employed an open-file policy with the defense during the course of this trial and relied upon the same written ballistics reports that were provided to the defense counsel, which did not clearly disclose the involvement of a second gun.

Pippin now contends that the prosecutor withheld this information from the defense.  Thus, Pippin asserts that this court should issue a COA because the district court's resolution of his Brady claim was debatable among jurists of reason.  The Texas Court of Criminal Appeals held that Pippin failed to

-11-

establish the materiality of the evidence that two guns were involved.  In resolving this claim of error, the court observed that "failure to disclose evidence favorable to the defendant is constitutional error only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Pippin v. State, No. 72,252, slip op. at 21 (citing United States v. Bagley, 473 U.S. 667, 682 (1985)).  The court reasoned that (1) defense counsel had learned about the evidence in time to cross-examine Anderson and (2) the jury had Elmer Buitrago's eyewitness statement identifying Pippin as the shooter.  Id. at 21-22. Therefore, the court found that Pippin had failed to demonstrate a "reasonable probability" that the result of the proceeding would have been different to support his Brady claim.

Although finding the facts somewhat unclear, the district court correctly focused on the state court's resolution of the alleged Brady violation to determine whether it was contrary to, or involved an unreasonable application of, clearly established federal law.  In examining the state court's findings, the district court noted that while Anderson's ballistics report fails to explicitly mention the possibility of a second gun, the prosecution's theory that Pippin was responsible for both deaths does not necessarily conflict with the available evidence from

-12-

the ballistics report.[7]  According to the district court, the report did clearly state that Anderson could not identify two of the bullets (designated EB-3 and EB-4) from Fabio Buitrago's body.  The report also affirmatively indicated, however, that bullets EB-1 and EB-2 recovered from Fabio Buitrago's body were fired from the same gun as one of the two bullets recovered from Elmer Buitrago's body.

To establish a Brady claim, the petitioner must demonstrate: (1) the prosecutor suppressed evidence, (2) favorable to the defense, and (3) material to guilt or punishment.  Brady, 373 U.S. at 87; Miller v. Dretke, 404 F.3d 908 (5th Cir. 2005).  The suppressed evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles v. Whitley, 514 U.S. 419, 437 (1995) ([T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely new effect of all such evidence and make disclosure when the point of 'reasonable

---

[7]  A claim that is largely speculative with respect to the effect of the allegedly exculpatory evidence on the jury's ultimate determination of guilt or innocence cannot support a Brady violation.  See Medellin v. Dretke, 371 F.3d 270, 281 (5th Cir. 2004) (declining to issue a COA where the Brady claim depended upon a "substantial degree of speculation"); Hughes v. Johnson, 191 F.3d 607, 630 (5th Cir. 1999) (denying an evidentiary hearing to investigate a "purely speculative" Brady claim underlying the petitioner's request for a COA).

probability' is reached."). Pippin contends that the fact that the defense had a separate ballistics expert does not obviate the state's affirmative obligation to disclose material exculpatory evidence under Brady. The state argues, however, that the evidence that two guns had been used to shoot Elmer Buitrago was equally available to defense expert Floyd McDonald. See Rector v. Johnson, 120 F.3d 551, 558-59 (5th Cir. 1997) ("The State has no obligation to point the defense toward potentially exculpatory evidence when that evidence is either in the possession of the defendant or can be discovered by exercising due diligence."). Moreover, the state maintains that Pippin's arguments more accurately question the competence of his own expert witness, rather than demonstrate any negligent or intentional withholding of evidence on the part of the prosecution.

Because the defense ballistics expert Floyd McDonald had full access to the ballistics evidence and an opportunity to conduct his own tests before trial, we conclude that the district court's resolution of Pippin's Brady claim is not debatable among jurists of reason. As the district court pointed out, notwithstanding the confusion in Anderson's report, the record does not show that the prosecution actually withheld any exculpatory evidence from the defense during the trial to satisfy the first prong of the Brady inquiry. See United States v. Agurs, 427 U.S. 97, 109 (1976) (noting that "there is 'no constitutional requirement that the prosecution make a complete

-14-

and detailed accounting to the defense of all police investigatory work on a case'") (quoting Moore v. Illinois, 408 U.S. 786, 795 (1972)). Although the district court acknowledged that due process is offended when the prosecution withholds exculpatory evidence, the state "bears no responsibility to direct the defense toward potentially exculpatory evidence that either is in the possession of the defense or can be discovered through the exercise of reasonable diligence." Bigby v. Dretke, 402 F.3d 551, 574-75 (5th Cir. 2005) (citing Rector, 120 F.3d at 558-59 (5th Cir. 1997)); see also Kutzner v. Cockrell, 303 F.3d 333, 336 (5th Cir. 2002) (explaining that "defendant must bear the responsibility of failing to conduct a diligent investigation" when the exculpatory evidence is available to both defense and prosecution); United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990) (noting that Brady "does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case"); United States v. Brown, 628 F.2d 471, 473 (5th Cir. 1980) ("[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim."). Indeed, the district court concluded that Pippin's own expert Floyd McDonald was provided sufficient opportunity to independently examine the ballistics evidence before trial. Thus, we decline to issue a COA on this ground.

-15-

## 2.    The Jury Instruction Claim

Pippin next argues that he was denied due process by the trial court's refusal to instruct the jury on the lesser included offense of felony murder.  Specifically, Pippin contends that his own testimony at trial provided a basis for the jury to rationally find him guilty only of felony murder, rather than capital murder.  He maintains that the district court's conclusion on the propriety of his jury instruction is debatable among reasonable jurists and accordingly asks this court to issue a COA on this ground.

The Texas Court of Criminal Appeals found no due process violation in the trial court's jury instruction.  Due process requires that a defendant receive a charge on a lesser-included offense if: (1) the lesser offense is included within the proof necessary to establish the offense charged, and (2) there exists some evidence in the record that would permit a jury rationally to find, if the defendant is guilty, he is guilty only of the lesser offense. Pippin v. State, No. 72,252, slip op. at 25 (citing Wolfe v. State, 917 S.W.2d 270, 278 (Tex. Crim. App. 1996)).  Although the court acknowledged that felony murder is a lesser included offense of capital murder under the first prong of the analysis, the court held that there was no due process violation because Pippin had received a jury charge that incorporated the lesser-included offenses of aggravated

-16-

kidnapping and kidnapping.

In reaching its conclusion, the state court focused on Pippin's testimony at trial that he was involved only in the abduction and confinement for several days of the victims. Throughout his trial, Pippin steadfastly maintained that he played absolutely no role in the actual killings. The court concluded that the actions he admitted to at trial "d[id] not constitute the commission or attempted commission of an 'act clearly dangerous to human life that cause[d] the death' of one or both of the victims." Id. at 27 (quoting TEX. PENAL CODE § 19.02(a)(3)). Therefore, the court found no error in trial court's decision to provide the lesser-included offenses of aggravated kidnapping and kidnapping, rather than felony murder, in the jury instructions.

Following the same reasoning, the district court determined that the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law. Due process requires a jury charge on a lesser included offense "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense––but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ." Beck v. Alabama, 447 U.S. 625, 637 (1980). A lesser included offense charge serves to protect the jury (and, by extension, the criminal defendant) from the false dichotomy of choosing between convicting on the capital charges

-17-

or outright acquittal when a "third option" of a lesser included offense exists.  Id.  As the district court correctly noted, however, because the jury in Pippin's case was instructed on the lesser included offense of aggravated kidnapping, the due process concerns at the heart of Beck were not implicated.

The district court found that the state court's conclusion that this jury instruction did not run afoul of the "fundamental concern in Beck" was not contrary to, nor an unreasonable application of, clearly established federal law.  Schad v. Arizona, 501 U.S. 624, 646 (1991) (clarifying the requirements of Beck to provide an alternative lesser included offense, but not necessarily all conceivable ones, in the jury charge to comport with due process); Livingston v. Johnson, 107 F.3d 297, 313 (5th Cir. 1997) (declining to issue a COA where the trial court did not need to provide a "wider menu of jury instructions" under Beck and Schad).  Therefore, Pippin has not made a substantial showing of the denial of a constitutional right that would merit the issuance of a COA under § 2253(c)(2).  In light of the clarifying language in Schad, we conclude that jurists of reason could not debate the district court's resolution of this claim and deny Pippin's request for a COA on this issue as well.

### 3.  The Inattentive Juror Claim

Pippin argues that the presence of an inattentive juror during his criminal trial violated his constitutional right to

due process.  More specifically, Pippin raised a claim in his state habeas application that a member of the jury was reading a book during part of his defense counsel's presentation.  Pippin relied upon the single uncorroborated affidavit of his brother-in-law Michael L. Martin to support this claim.  During the state habeas proceedings, both Pippin's attorneys and the prosecutor submitted sworn statements flatly rejecting this observation and noting that the small size of the courtroom would have made it impossible for such behavior to escape notice.  In weighing the credibility of the affiants, the state habeas court found no due process violation for the allegedly inattentive juror.  When Pippin raised the same claim in his federal habeas petition, the district court concluded that Martin's affidavit was insufficient to rebut the presumption of correctness afforded to the state habeas court's factual finding under § 2254(e)(1).  See 28 U.S.C. § 2254(e)(1) (providing that "a factual issue made by a State court shall be presumed to be correct" and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").

In light of the deferential standard under § 2254(e)(1), reasonable jurists could not debate the district court's conclusion that the state habeas court's determination was not contrary to, or an unreasonable application of, clearly established federal law.  A trial court's credibility determinations made on the basis of conflicting evidence are

-19-

entitled to a strong presumption of correctness and are "virtually unreviewable" by the federal courts.  Moore v. Johnson, 194 F.3d 586, 605 (5th Cir. 1999) (citing Marshall v. Lonberger, 459 U.S. 422, 432 (1983)).  Therefore, the district court correctly deferred to the state court's reasonable weighing of this conflicting evidence.  We decline to issue a COA on this claim.

## C.    Ineffective Assistance of Counsel Claim

Pippin's claim of ineffective assistance of counsel is closely related to his Brady claim.  Specifically, Pippin argues that the state's failure to disclose evidence that two guns had been used to shoot the victim rendered his counsel unable: (1) to effectively conduct voir dire; (2) to elicit a timely confession from Aaron Loweth, who participated in the kidnappings and allegedly boasted to acquaintances after the killings that he had "popped" someone; (3) to effectively impeach Abraham Pacheco's testimony; and (4) to negotiate a plea agreement to a lesser offense.  Beyond reiterating its arguments with respect to the Brady claim, the state maintains that the strategic trial decisions of Pippin's attorneys in dealing with the testimony of Loweth and Pacheco cannot support an ineffective assistance claim.[8]  The state also disputes that the evidence of a second

_____

[8]    With respect to Loweth's testimony, the state questions whether the existence of a second weapon would have exculpated Pippin in any manner.  Loweth testified that Pippin instructed him to dispose of the murder weapon following the shootings, and

-20-

gun would have placed Pippin in a better pretrial bargaining position.

Looking to the state habeas court's reasoning, the district court rejected Pippin's claim of ineffective assistance of counsel on two separate grounds.  First, the district court agreed with the state habeas court's finding that the claims were procedurally defaulted.  See Sayre v. Anderson, 238 F.3d 631, 634 (5th Cir. 2001) ("When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment.").  Specifically, the state habeas court found that Pippin's claims were not properly before the court because they were first presented in his pro se state habeas application, even though his counsel subsequently incorporated them into a supplemental application.  Under Texas law, state habeas petitioners are not entitled to hybrid representation. Rudd v. State, 616 S.W.2d 623, 625 (Tex. Crim. App. 1981) (holding that a defendant is not entitled to hybrid representation).  The district court recognized that the state

---

it is difficult to comprehend how a second gun would have shifted blame away from Pippin or harmed the state's case in any material way.  Moreover, as the district court noted, Pippin was not convicted of the homicide about which Loweth boasted to his girlfriend.  Therefore, in accordance with the state habeas court's decision, the district court concluded that the decision to avoid placing this information before the jury was a valid and reasonable trial strategy entitled to deference.

habeas court considered the merits of the ineffective assistance of counsel claim only in the alternative. The district court held that the state habeas court's finding was not contrary to, or an unreasonable application of, clearly established federal law. Because reasonable jurists could not debate the district court's conclusion in this regard, we will not issue a COA for ineffective assistance of counsel in this case.

Although finding the claims procedurally defaulted, the district court nonetheless examined the state habeas court's treatment of Pippin's various claims of ineffective assistance of counsel under the familiar test established in Strickland v. Washington, 466 U.S. 668 (1984), and found that the state court's alternative conclusion that Pippin had not established a Sixth Amendment violation was not contrary to, or an unreasonable application of, clearly established federal law. Although the district court's conclusion is not, in our view, debatable among jurists of reason, we pretermit any discussion of it in view of the adequacy of the procedural default determination.

We decline to issue a COA on Pippin's ineffective assistance of counsel claims.

**D.  Sixth Amendment Confrontation Claim**

Pippin argues that the admission into evidence of Elmer Buitrago's dying declaration to Officer Parodi before the ambulance arrived identifying Pippin as the shooter violated

Pippin's right to confront his accuser under the Sixth Amendment. Again, Pippin attempted to raise this claim for the first time in his pro se state habeas application, which was dismissed as an abuse of the writ. Ex parte Pippin, Nos. 50,613-01, -02, -03. Following the reasoning provided in the state habeas court's decision, the district court accordingly found the claim to be procedurally defaulted.

Even if not procedurally defaulted, the district court's habeas review did not show that the state court's findings were contrary to, or involved an unreasonable application of, clearly established federal law. In fact, the district court noted that dying declarations and excited utterances are well-established exceptions to the hearsay rule and are admissible in evidence.[9] See FED. R. EVID. 803(2), 804(b)(2). Contrary to Pippin's argument, the district court's review of the trial testimony of Officer Parodi clearly demonstrated that the factual predicate for the dying declaration exception to the hearsay rule had been established.[10] Pippin has offered nothing beyond a cursory

---

[9] The Texas Court of Criminal Appeals relied exclusively upon the excited utterance exception to the hearsay rule and did not consider Pippin's argument with respect to the dying declaration exception. Pippin v. State, No. 72,252, slip op. at 14.

[10] In order to be admissible under the dying declaration exception, the statement must be made while the declarant is conscious of impending death and believes he has no hope of recovery. Herrera v. Collins, 904 F.2d 944, 949 n.5 (5th Cir. 1990). Pippin does not argue that Elmer Buitrago was unaware of his impending death when he identified Pippin as the shooter.

-23-

historical survey of the Confrontation Clause to suggest that we should transform a matter of state evidentiary law into a federal constitutional issue worthy of additional review.  See Herrera, 904 F.2d at 949 (finding no error in the admission of dying declaration testimony and noting that "this Circuit resists challenges to evidentiary matters by collateral habeas corpus review").  We conclude that reasonable jurists could not debate the district court's resolutions of this claim and accordingly deny Pippin's request for a COA.

**E.    Denial of Right to Depose the Prosecutor Claim**

Finally, the issue of whether the district court should have allowed Pippin to take a particular deposition does not raise any constitutional issues--indeed, Pippin does not even argue that it does--and it is not, therefore, the proper subject of an application for a COA.  Since we have concluded that a COA will not issue as to any of Pippin's constitutional claims, we have no jurisdiction to consider the deposition matter.  See 28 U.S.C. § 2253(c).

### III.  CONCLUSION

Because Pippin has not shown that reasonable jurists could debate the district court's resolution of his various constitutional claims, we DENY Pippin's application for a COA.

---

Instead, he relies on an exceptionally broad construction of the Sixth Amendment's Confrontation Clause protections that has no basis in the Supreme Court's law or this circuit's precedent.