# United States Court of Appeals
# for the Fifth Circuit

No. 24-70003

United States Court of Appeals
Fifth Circuit

**FILED**
February 6, 2025

Lyle W. Cayce
Clerk

Obel Cruz-Garcia,

*Petitioner—Appellant*,

*versus*

Eric Guerrero, *Director, Texas Department of Criminal Justice, Correctional Institutions Division*,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-3621

Before Smith, Southwick, and Wilson, *Circuit Judges*.
Cory T. Wilson, *Circuit Judge*:

In 2013, Obel Cruz-Garcia was convicted of capital murder and sentenced to death by a Texas court. His conviction and sentence were affirmed on direct appeal, and the Texas Court of Criminal Appeals (TCCA) rejected his initial and successive state habeas applications. The district court subsequently denied Cruz-Garcia's federal habeas petition. Cruz-Garcia now seeks a certificate of appealability (COA) in this court under 28 U.S.C. § 2253(c). For the following reasons, we deny his motion for a COA.

No. 24-70003

# I.

In 1992, Angelo Garcia, Jr., the six-year-old son of Arturo Rodriguez and Diana Garcia, was kidnapped and murdered. The TCCA described the events leading up to the kidnapping:

> On September 30, 1992, two masked intruders broke into an apartment shared by Arturo Rodriguez, Diana Garcia, and Diana Garcia's six-year-old son, Angelo Garcia, Jr. Diana was awakened by a loud sound coming from her living room. Her husband, Arturo, walked toward the sound but was quickly met by a large male wearing a mask and pointing a gun at him. . . .
>
> The masked man instructed Diana to turn face down on her bed and then began beating Arturo. After Diana complied with the instruction to lie face down, a second man entered the room holding a gun, and one of the intruders tied up Diana. Arturo was tied up with the cord from his alarm clock, a rag was put in his mouth, and he was beaten on his head with a gun while he knelt by his bed. At this point, Angelo, who had been sleeping on a pallet by the bed, began crying out for Diana.
>
> The second intruder then started touching Diana on her buttocks, turned her over so that she was lying on her back, and put a blanket over her face. The second intruder removed Diana's panties and sexually assaulted her. Diana testified that the assailant ejaculated during the sexual assault. Arturo testified that he saw an unknown male sexually assaulting his wife before the other assailant placed a pillowcase over his head. All the while, Angelo was present in the room and crying.
>
> Once the sexual assault ended, the two men ransacked the bedroom and then left. . . . After both intruders left, Diana and Arturo left their apartment and began looking for Angelo. They called out his name at their own apartment complex and across the street but received no response. At some point, Diana's neighbor called 911. Houston Police Department

("HPD") responded to a 911 call claiming that a child had been kidnapped from Diana and Arturo's apartment.

*Cruz-Garcia v. State*, No. AP-77,025, 2015 WL 6528727, at *1 (Tex. Crim. App. Oct. 28, 2015).

About a month later, Angelo's body was found washed up on the shore of a water basin, and his death was ruled a homicide. Upon learning that Arturo and Diana had previously sold drugs for Cruz-Garcia, law enforcement suspected Cruz-Garcia, but they could not locate him. Officers collected DNA evidence from the crime scene consisting of a sexual-assault kit containing vaginal swabs taken from Diana, Diana's underwear from the night of the attack, and an unlit cigar found in the apartment. But the DNA evidence proved unhelpful because the "male fraction DNA was too degraded" and HPD lacked a DNA sample from Cruz-Garcia. The case thus went cold.

In 2007, more than a decade later, the investigators found Cruz-Garcia in a Puerto Rican prison and obtained a DNA sample from him. Subsequent DNA testing made possible by scientific advances linked Cruz-Garcia to the DNA evidence from the crime scene. Cruz-Garcia was indicted in 2008, and he was tried in 2013. Cruz-Garcia sought to suppress the State's DNA evidence, citing well-publicized problems regarding the HPD crime lab's practices and procedures around the time it handled the DNA evidence in this case. After a suppression hearing, the trial court denied Cruz-Garcia's motion to suppress the DNA evidence. At trial, the State also called Cruz-Garcia's ex-wife, Angelita Rodriguez, and his codefendant, Carmelo Santana, as witnesses against Cruz-Garcia.

Rodriguez testified that Cruz-Garcia had hastily left the country around the time of the murder and later confessed to her that he killed Angelo. Santana, who admitted to keeping watch in the car while the crime

took place inside Diana's apartment, testified that Cruz-Garcia had raped Diana and ordered another accomplice to kill Angelo after kidnapping him.

In July 2013, the jury found Cruz-Garcia guilty of capital murder. After a separate sentencing hearing, the trial court sentenced Cruz-Garcia to death and denied Cruz-Garcia's motion for a new trial. On direct appeal, the TCCA affirmed the conviction and sentence, and it subsequently denied Cruz-Garcia's initial, second, and third state habeas applications. In 2023, the district court considered and denied his federal habeas petition in a detailed, 126-page order. *Cruz-Garcia v. Lumpkin*, No. 17-CV-3621, 2023 WL 6221444, at *62–63 (S.D. Tex. Sept. 25, 2023).

Cruz-Garcia now seeks a COA in this court to challenge the district court's ruling.

## II.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner seeking to appeal a district court's denial of habeas relief must first obtain a COA from this court, which requires the petitioner to make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To this end, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). While this court makes a "general assessment" of the merits, it is not a "full consideration of the factual or legal bases adduced in support of the claims." *Id.* at 336; *see also Buck v. Davis*, 580 U.S. 100, 114–16 (2017) ("The COA inquiry, we have emphasized, is not coextensive with a merits analysis."). Because this case involves the death penalty, "any doubt as to whether a COA should issue . . . must be resolved in favor of the petitioner." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

No. 24-70003

In considering whether the district court's denial of habeas relief is debatable, this court is "mindful of the deferential standard of review the district court applied to [Cruz-Garcia's claims] as required by the AEDPA." *Miniel v. Cockrell*, 339 F.3d 331, 336 (5th Cir. 2003). That is, the district court must deny relief for claims that were adjudicated on the merits by the state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08 (2000)). And "[a] state court's decision constitutes an unreasonable application of clearly established federal law if it is 'objectively unreasonable.'" *Id.* "[A] determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.

Having dropped many of the claims he presented to the district court, Cruz-Garcia now raises three issues in seeking a COA: (A) jurors' resort to the Bible as an improper external influence during deliberations at the sentencing hearing, (B) ineffective assistance of trial counsel, and (C) Cruz-Garcia's inability to present a complete defense due to the trial

5

court's exclusion of DNA evidence. For the first and third issues, Cruz-Garcia also contends that the state habeas court did not adjudicate the claims on the merits, meaning the usual AEDPA deference would not apply. *See* 28 U.S.C. § 2254(d).

## A.

After he was sentenced, Cruz-Garcia first sought a new trial, asserting that jurors were exposed to improper outside influence during the sentencing hearing because they consulted the Bible during deliberations. The TCCA determined that the trial court did not abuse its discretion in denying Cruz-Garcia's motion for a new trial, explaining that "[t]he jury foreman's reference to his Bible in an attempt to comfort his fellow juror was not an outside influence." *Cruz-Garcia*, 2015 WL 6528727, at *29. More broadly, the TCCA held that a juror's reference to the Bible that "d[oes] not directly relate to a fact at issue before the jury" does not constitute improper outside influence. *Id.*

Typically, "[d]uring an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations." Tex. R. Evid. 606(b)(1). However, a juror may testify "about whether an outside influence was improperly brought to bear on any juror." *Id.* 606(b)(2)(A).[1] Under Texas law, an improper outside influence is one that originates "from a source outside of the jury room and other than from the jurors themselves." *McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012). But outside

---

[1] This rule mirrors its federal counterpart. *See* Fed. R. Evid. 606(b)(2) ("A juror may testify about whether: (A) extraneous prejudicial information was improperly brought to the jury's attention; [or] (B) an outside influence was improperly brought to bear on any juror. . . .").

influence "does not include influences or information . . . unrelated to trial issues." *Colyer v. State*, 428 S.W.3d 117, 127 (Tex. Crim. App. 2014).

There is some dispute as to when the Bible was referenced and whether any verses were read aloud. A juror, Angela Bowman, testified via affidavit that the jury foreman, Matthew Clinger, read from the Bible in the jury room, which changed the vote of another juror, Casey Guillotte. Guillotte, on the other hand, stated that Clinger only offered the Bible as emotional support after the jurors had already come to a unanimous decision on all questions. Guillotte was adamant that Clinger did not "read the [B]ible verse to the jury or refer directly to a specific verse or passage from the Bible." Clinger's own affidavit corroborated Guillotte's.

The district court denied Cruz-Garcia's external influence claim,[2] explaining that "Cruz-Garcia has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law." The district court deferred to the state court's factual determinations that a juror's "[r]eferring to the Bible did not directly relate to a fact at issue before the jury in Cruz-Garcia's case, and the jury was not called upon to decide a fact issue based on anything other than the evidence properly admitted before it." *Cf.* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.").

It is unclear to what extent "clearly established Federal law" addresses this issue. *See id.* § 2254(d)(1). Though the Supreme Court "has clearly established a constitutional rule forbidding a jury from being exposed

---

[2] The TCCA referred to the Bible as a potential "outside influence," tracking the phrasing of the Texas rule. *See* TEX. R. EVID. 606(b)(2)(A). This court has previously termed the question as one of "external influence." *See Oliver v. Quarterman*, 541 F.3d 329, 334–36 (5th Cir. 2008). The district court used the terms interchangeably, *see Cruz-Garcia*, 2023 WL 6221444, at *14–19, and we see no meaningful distinction in the phrasing.

to an external influence," it has not spoken directly to this specific issue, i.e., reference to the Bible during jury deliberations. *Oliver v. Quarterman*, 541 F.3d 329, 335–36 (5th Cir. 2008) (citing Supreme Court cases regarding external influence). And the Supreme Court has rejected the idea that "circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced" itself for the purpose of identifying "clearly established Federal Law." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Even so, the holding of the TCCA is consistent with how this court has treated the Bible in an analogous context. In *Oliver*, this court examined a jury's reference to the Bible during deliberations. 541 F.3d at 340. Noting that "the Bible [may] inform[ ] jurors' general outlook of the world and their moral values in particular," the court stated that "jurors may constitutionally rely upon those morals in their deliberations." *Id.* But "when a juror brings a Bible into the deliberations and points out to her fellow jurors specific passages that describe the very facts at issue in the case, the juror has crossed an important line." *Id.* at 339. In *Oliver*, "several jurors collectively consulted a Bible, in the jury room, and likely compared the facts of [that] case to the passage that teaches that capital punishment is appropriate for a person who strikes another over the head with an object and causes the person's death." *Id.* at 340. The court held that the "[t]he jury's use of the Bible during the sentencing phase . . . amounted to an improper external influence." *Id.* at 344. However, because the defendant failed to show that the Bible prejudiced the jury's decision, our court nonetheless affirmed the district court's denial of habeas relief. *Id.*

Here, the jurors did not reference the Bible in the way that the jurors did in *Oliver*. There is no allegation that the jurors compared the facts of Cruz-Garcia's case to any specific Bible passage. Bowman's affidavit merely states that Clinger "pulled out his Bible" and that he "read scriptures from

8

the Bible."[3] Based on the record before us, under the standard articulated in *Oliver*, reasonable jurists would not disagree with the district court's thorough resolution of Cruz-Garcia's external influence claim in the State's favor.

Similarly, Cruz-Garcia's argument that the state court did not adjudicate his external influence claim on the merits falters. "[T]he presumption that the federal claim was adjudicated on the merits may be rebutted" when the applicable state standard is less protective than the federal standard. *Johnson v. Williams*, 568 U.S. 289, 301–02 (2013). But the state standard in this instance is not less protective than the federal standard—as discussed *supra*, they are materially identical. And the state court's approach expressly rested on *Oliver* and a similar case from the Fourth Circuit. *See Cruz-Garcia*, 2015 WL 6528727, at *29 nn.107 & 108 (referencing *Oliver* and *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006)). Cruz-Garcia's argument that the TCCA did not adjudicate his federal claim on the merits thus fails.

---

[3] Cruz-Garcia does not account for the lack of connection between the Bible passage that was purportedly read—from Paul's Epistle to the Romans—and the specific facts of this case. In his brief, Cruz-Garcia asserts that Romans is relevant because it "include[s] discussions of capital punishment. *See, e.g.*, ROMANS 13, 6:23." But neither of these passages, though referencing punishment and death, relates to the specific facts of the case. *See* ROMANS 13:3–4 (NKJV) ("For rulers are not a terror to good works, but to evil. Do you want to be unafraid of the authority? Do what is good, and you will have praise from the same. For he is God's minister to you for good. But if you do evil, be afraid; for he does not bear the sword in vain; for he is God's minister, an avenger to execute wrath on him who practices evil."); *id.* 6:23 (NKJV) ("For the wages of sin is death, but the gift of God is eternal life in Christ Jesus our Lord.").

In sum, we discern no debatable error in the district court's meticulous analysis of these issues.  Accordingly, Cruz-Garcia is not entitled to a COA as to his external influence claim.

**B.**

Cruz-Garcia next brings a claim for ineffective assistance of counsel, contending that he was prejudiced by his trial counsel's deficient performance and strategic choices.  The district court endorsed the state habeas court's conclusion that Cruz-Garcia "failed to show by a preponderance of the evidence that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense."  We agree.

A defendant raising a Sixth Amendment ineffective assistance claim must show that his "counsel's performance was deficient," and that "the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id.* at 686.  "The court must then determine whether . . . the identified acts or omissions were outside the wide range of professionally competent assistance."  *Id.* at 690.  Notably, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citations omitted).

A threshold question before the district court was whether to treat Cruz-Garcia's ineffective assistance claim as a single claim or as a series of distinct claims:  In his initial state habeas application, Cruz-Garcia presented

the alleged deficiencies in trial counsel's performance as separate grounds for relief. They were all severally denied. In his subsequent state habeas applications, Cruz-Garcia "rolled all his previous *Strickland* arguments into a single claim." His repackaged *Strickland* claim was supported by the same "reasons" he had raised in his initial state habeas application, but he also alleged several new deficiencies. Likewise, in his federal habeas application, he presented his *Strickland* claim as a single claim.

Relying on this court's disapproval of attempts by petitioners to "smush[ ] together separate [related] claims to create a new one that the state never considered," *Lucio v. Lumpkin*, 987 F.3d 451, 481 (5th Cir. 2021), the district court disallowed Cruz-Garcia's attempt to roll his *Strickland* claims into one "new" claim. Instead, the court applied AEDPA deference to the distinct ineffective assistance claims that were adjudicated by the state court in Cruz-Garcia's initial state habeas proceeding. The district court then rejected the alleged deficiencies that Cruz-Garcia had not raised in his initial application, as procedurally defaulted and also meritless. Now, in his motion for a COA, Cruz-Garcia raises four claims (1–4) initially raised in his first state habeas action, and one (5) that the district court concluded had been procedurally defaulted.

### 1. *Failure to retain a DNA expert*

Cruz-Garcia asserts that he was prejudiced by trial counsel's failure to retain a DNA expert who could have more effectively challenged the reliability of the State's DNA evidence. He points out that the HPD crime lab, which initially processed the DNA evidence from this case, was mired with reports of incompetence in the early 2000s, leading to its eventual closure and reopening. *See Cruz-Garcia*, 2015 WL 6528727, at *12 n.21. Cruz-Garcia also relies on an affidavit first submitted in the state habeas court from a DNA expert who raised concerns about the testing methodology used

by Orchid Cellmark, an independent forensic lab that conducted the DNA testing introduced by the State in the case.

The state habeas court found that trial counsel had years of experience handling DNA evidence in trials, and counsel vigorously sought to suppress the State's DNA evidence at trial. Specifically, "[t]rial counsel filed a pre-trial motion to suppress the results of all DNA testing which focused on problems with the old HPD crime lab and alleged that the physical evidence in Cruz-Garcia's case was contaminated and the DNA analysis was unreliable." *Cruz-Garcia*, 2015 WL 6528727, at *33. And counsel supplemented his motion by offering "the Bromwich report,[4] the HPD internal affairs investigation summary, and internal complaint reports regarding various HPD crime lab employees." Cruz-Garcia's post-hoc speculation that a DNA expert would have been more successful in neutralizing the State's DNA evidence does not undermine counsel's strategic choices otherwise to give rise to a viable ineffective assistance claim. *See Strickland*, 466 U.S. at 686. Though the trial court denied Cruz-Garcia's motion to suppress, his counsel rendered effective assistance in pressing the issue, and we decline to "second-guess counsel's assistance after conviction." *Id.* at 689.

### 2. *Failure to challenge future dangerousness*

Pointing to a supposedly exemplary record while imprisoned in Puerto Rico, Cruz-Garcia asserts that trial counsel should have more vigorously challenged the State's case regarding his future dangerousness. But trial counsel is "entitled to formulate a strategy that was reasonable at the time

---

[4] The Bromwich report, named for its author, "was initiated in response to the closure of the old HPD crime lab in 2003 and heavily criticized the lab in the areas of quality assurance, internal auditing, training, and standard operating procedure." *Cruz-Garcia*, 2015 WL 6528727, at *14.

and to balance limited resources in accord with effective trial tactics and strategies." *Evans v. Davis*, 875 F.3d 210, 218 (5th Cir. 2017) (quoting *Richter*, 562 U.S. at 107). "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *United States v. Shepherd*, 880 F.3d 734, 741 (5th Cir. 2018) (quoting *Strickland*, 466 U.S. at 690–91). Trial counsel concluded that Cruz-Garcia's future dangerousness was not worth contesting given his extensive, and violent, criminal history—recounted in detail by his codefendant Santana during the sentencing phase. To the contrary, counsel believed that "'an impassioned plea that he would not be a future danger' would cause him to lose credibility with jurors." And as the district court noted, contrary to Cruz-Garcia's characterization of his time in Puerto Rican prison, he was not a "model prisoner" but, *inter alia*, attempted an escape. Cruz-Garcia's counsel has proffered a reasonable explanation for his strategic choice, and this claim lacks arguable merit.

### 3. Failure to investigate Diana and Cruz-Garcia's purported consensual relationship

Cruz-Garcia's counsel suggested during trial that the presence of Cruz-Garcia's DNA in the sample collected from Diana could be explained by an ongoing consensual sexual relationship at the time. Cruz-Garcia now proffers several witnesses who could have attested to this alleged relationship and argues that his trial counsel should have produced these individuals during trial.

Regardless of whether these individuals could have provided exonerating testimony, it was Cruz-Garcia who hindered the search for witnesses by remaining persistently uncooperative during trial. According to his lead counsel, Cruz-Garcia "would not discuss the facts of this case with [his defense attorneys]." Instead, Cruz-Garcia told them that "God would

deliver him . . . [and] send angels to protect him." On this specific issue, according to the state habeas court, even after "trial counsel explained to Cruz-Garcia numerous times that evidence of [a] consensual sexual relationship with Diana Garcia would have been the best attempt to [neutralize] the State's DNA evidence," Cruz-Garcia refused to name anyone who could serve as a defense witness. And the defense team's investigator could not find any witness to corroborate the alleged relationship. Considering Cruz-Garcia's own refusal to cooperate with counsel, it is especially hard to discern cognizable ineffective assistance by counsel on this issue.

Cruz-Garcia relies on a 2015 affidavit from Cesar Rios, who averred that there had been a sexual relationship between Cruz-Garcia and Diana, and that he "remember[ed] talking to one person on the defense team briefly." Cruz-Garcia asserts that trial counsel should have followed up on that conversation. But the affidavit contains no information about when the conversation took place, the topics raised, or who from the defense team spoke to Rios. It is thus insufficient to sustain an ineffective assistance claim, and this claim fails to justify a COA.

### 4. Failure to retain a mitigation specialist

Cruz-Garcia also argues that trial counsel should have retained a mitigation specialist who could have conducted a mitigation investigation and brought attention to Cruz-Garcia's unstable and impoverished background. Though counsel did not retain a mitigation specialist, he called four witnesses who testified about Cruz-Garcia's background as well as his positive attributes. And counsel also retained an investigator, who developed mitigating evidence, and consulted a psychologist. This ineffective assistance claim also fails to merit a COA.

No. 24-70003

### 5.  *Failure to investigate Carmelo Santana*

Finally, Cruz–Garcia asserts that trial counsel should have more thoroughly investigated his codefendant Carmelo Santana, one of the State's key witnesses, which would have revealed Santana's child-assault conviction and history of mental health problems.  Cruz-Garcia argues that trial counsel could have undermined the reliability of Santana's testimony with this information.  But a competency evaluation of Santana in a separate federal criminal proceeding did not find incompetency, and the jury in this case was given plenty of other reasons to doubt his testimony.  Santana was cross-examined regarding a different "misdemeanor assault conviction," and the jury "understood that Santana's life was full of lawlessness and violence."  The jury also learned about his "involvement in the drug business."  Thus, counsel's failure to investigate Santana further did not prejudice Cruz-Garcia, such that this claim lacks arguable merit.  Additionally, because Cruz-Garcia cannot show prejudice, he cannot overcome the procedural bar for this claim,[5] as the district court astutely concluded.

To recap:  None of Cruz-Garcia's assertions marshalled in support of his ineffective assistance claim "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Miller-El*, 537 U.S. at 338.  The district court properly determined that Cruz-Garcia failed to meet the "doubly deferential" AEDPA standard

---

[5] "[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default" or a demonstration "that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." *Dretke v. Haley*, 541 U.S. 386, 388 (2004).

for relief based on alleged ineffective assistance of counsel. *Harrington*, 562 U.S. at 105.

## C.

Cruz-Garcia last argues that his right to present a complete defense was denied because the trial court excluded evidence of the unreliability of the State's DNA evidence. He also contends that the state court failed to adjudicate this claim on the merits, which, if true, would preclude the usual § 2254(d) deference afforded to the state court's evaluation of that claim. The district court disagreed, concluding that Cruz-Garcia had "not met the high standards for relief on a complete-defense claim, whether considered under a *de novo* review or under AEDPA's deferential standards." The district court did not err.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Cruz-Garcia avers that he was prevented from introducing evidence detailing the old HPD Crime Lab's mishandling of DNA evidence and disciplinary sanctions against the DNA technicians who initially processed the DNA evidence in his case. The trial court ruled that the evidence was irrelevant because none of the technicians had been called to testify against Cruz-Garcia, and "none of the results of the tests performed by any old HPD crime lab employees were offered into evidence." *Cruz-Garcia*, 2015 WL 6528727, at *14. The excluded evidence would therefore not have helped Cruz-Garcia's case. Yet the trial court gave Cruz-Garcia the opportunity to introduce other evidence concerning the lack of reliability of the State's DNA evidence.

The trial court's approach was sound. As the TCCA discussed, "[t]he trial court explicitly stated it would allow cross-examination on the

issues of where the evidence was stored, whether those locations were proper, to whom the evidence was taken, and whether the storage conditions were proper for reducing or preventing contamination." *Id.* at \*15. Cruz-Garcia's assertion that he was not allowed to present a complete defense is thus unsupported by the record, and Cruz-Garcia fails to show that the district court arguably erred in rejecting his complete defense claim.

## IV.

For the foregoing reasons, and as painstakingly addressed by the district court, Cruz-Garcia fails to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), sufficient to justify a certificate of appealability as to any of his claims. His motion is

DENIED.